## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| IN RE: | : | **Case No. 17-50675** |
| **SKIPPER ENTERPRISE, LLC** | : | |
| Debtor. | : | **Chapter 7** |
| | : | |
| | : | **Judge Rebecca B. Connelly** |
| | : | |

_____

**MOTION OF CHAPTER 7 TRUSTEE FOR (I) AUTHORITY TO SELL PROPERTY OF THE
ESTATE AT PRIVATE SALE;  (II) AUTHORITY RELATED TO DISTRIBUTION OF SALE
PROCEEDS (III) ENTRY OF AN ORDER AUTHORIZING THE REJECTION OF UNEXPIRED
REAL PROPERTY LEASE; AND (IV) RELATED RELIEF**

_____

W. Stephen Scott, Trustee (the "Trustee") moves the Court to (i) grant the Trustee authority to

sell property of the estate at private sale, (ii) grant the Trustee authority related to the distribution of the

sale proceeds, and (iii) grant the Trustee authority to reject an unexpired real property lease pursuant to 11

U.S.C. § 365 and Bankruptcy Rule 6006, and (iv) grant related relief, as follows:

### Jurisdiction

1.      Skipper Enterprise, LLC ("Skipper Enterprise" or "Debtor") filed a petition under

Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy

Court for the Western District of Virginia (the "Court") on July 18, 2017 (the "Petition Date"),

commencing Case No. 17-50675 (the "Case").

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and §157(a).

This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3.      The Trustee was appointed the trustee at the meeting of creditors pursuant to section

702(d) of the Bankruptcy Code and continues to serve in that capacity.

### The Proposed Sale of Property of the Estate

4.      Prior to filing this Case, Skipper Enterprise operated a restaurant in Bristow, Virginia.

Skipper Enterprise's assets included the property (the "Property") listed in **Exhibit A**.

5.      Pursuant to section 541(a) of the Bankruptcy Code, the Debtor's interest in the Property became property of the estate upon the commencement of the Case.

6.      The Trustee has received an offer from BC Plaza, LLC (the "Purchaser"), to purchase the estate's interest in the Property for the sum of $10,000.00 and Purchaser's agreement to waive any potential claim against the Debtor (the "Purchase Price").

7.      The Purchase Price is reasonable under the circumstances. After considering costs of sale and the administrative claims for rent incurred to store the Property pending a sale, the Trustee is of the opinion that the Purchase Price is reflective of the fair market value of the estate's interest in the Property.

**Proposed Authority Related to Closing and Disposition of Sale Proceeds**

8.      Pursuant to section 105(a) of the Bankruptcy Code, the Court may issue any order that is necessary or appropriate to carry out the provisions of Title 11. Furthermore, Bankruptcy Rule 6004(f)(2) provides that the trustee shall execute any instrument necessary or ordered by the court to effectuate a transfer to a purchaser.

9.      It is necessary for the closing of the proposed sale of the Debtor's interest in the Property for the Trustee to execute and deliver a bill of sale and sign other closing documents to effectuate the transfer of the Property. The Trustee requests authority to sign and deliver a bill of sale and other usual and customary documents necessary for closing the sale.

**Proposed Authority to Reject Unexpired Real Property Lease**

10.     As part of its restaurant operations, Skipper Enterprise leased a restaurant location at 9110 Devlin Road, Building 3, Unit 160, Bristow, Virginia (the "Restaurant Location").

11.     The Restaurant Location was subject of a written lease dated November 9, 2016 by and between BC Plaza, LLC and Skipper Enterprise (the "Restaurant Lease") for $5,000.00 per month. A true and correct copy of the Restaurant Lease is attached hereto as **Exhibit B**.

12.     Skipper Enterprise ceased operations prior to the petition date.

13.     If the proposed sale outlined above is approved, Trustee wishes to reject the Restaurant

Lease as it is burdensome on the estate and the assets currently stored at these locations will no longer be part of the estate following the closing on the sale.

14.     Section 365(a) of the Bankruptcy Code provides that a "trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

15.     Therefore, the Trustee wishes to reject the Restaurant Lease, contingent upon the sale being approved by this Court.

16.     BC Plaza, LLC has consented to the relief requested herein.

**Effective Date of Order**

17.     Bankruptcy Rule 6004(h) provides that an order authorizing the sale of property is stayed until fourteen (14) days after entry of the order, unless the court orders otherwise. Under the circumstances of this proposed sale, and absent any objection to the proposed sale, cause exists for the Court to make its order granting this Motion to become effective immediately upon entry, as permitted by Bankruptcy Rule 6004(h).

WHEREFORE, the Trustee, moves the Court to enter an order (1) adopting the foregoing as its findings of fact and conclusions of law, (2) granting the Motion in its entirety, (3) authorizing the Trustee to sell the Debtor's interest in the Property at a private sale to the Purchaser on the terms set forth above, (4) authorizing the Trustee to sign and deliver the bill of sale and other usual and customary documents necessary for closing the sale, (5) providing that the order approving the proposed sale be effective immediately upon entry, (6) authorizing the Trustee to reject the Restaurant Lease, contingent upon the sale being approved by this Court, and (7) granting such other relief as is just.

Dated:   September 13, 2017               Respectfully submitted,
                                          W. STEPHEN SCOTT, TRUSTEE

/s/ W. Stephen Scott
W. Stephen Scott, Esq. (VSB #14301)
P.O. Box 1312,
Charlottesville, VA 22902
434-277-5520
wsscott7trustee@earthlink.net

# EXHIBIT A

## SKIPPER ENTERPRISE, LLC PROPERTY

Podium
50 dinner menus and 50 bar menus
Two outdoor signs with restaurant logo
Two 24" wide stainless steel shelves
Miscellaneous cleaning supplies and chemicals
Single door refrigerator
Single door freezer
Sandwich cooler – 3 drawers
Two drawer cold grills
Two stand-alone fryers
24" groove grill
24" flat grill
Salamander
6 burner stove
Kitchen utensils, pots and pans, dishes, bar accessories, glassware, steak knives
16 hydraulic table bases
9 high top hydraulic table bases
96" buffet style high top table
50 sets of salt and pepper shakers with logo
Bathroom décor
Miscellaneous wall hangings
Blinds
Faucet and hose dish sink
Dish faucet with hose
Fryer filter

# EXHIBIT B

## LEASE AGREEMENT

BETWEEN

BC PLAZA, LLC

AND

SKIPPER ENTERPRISES LLC

## ARTICLE 1
### PARTIES

101.    THIS SHOPPING CENTER LEASE (this "Lease"), made as of this __9__ day of _NoveEMBER 20(6_ by and between BC PLAZA LLC ("Landlord") and SKIPPER ENTERPRISES LLC, a Virginia Limited Liability Company, d/b/a Twisted Cork Grille ("Tenant").

## ARTICLE 2
### TERMS, CONDITIONS AND DEFINITIONS

201(a).    Premises:  Landlord leases to Tenant and Tenant leases from Landlord, for the Term (as defined) and upon the terms and conditions set forth in this Lease, the Premises, which for all purposes of this Lease shall be known as space number R7 deemed to contain 2,400 square feet of gross leasable area, more or less, located in Bristow Commons, at 9100 Devlin Road, Building 3, Unit 160, Bristow, Virginia 20136 (the "Shopping Center"), in the approximate location depicted on **Exhibit A**.   The Shopping Center is a part of a larger project as shown on **Exhibit A** (the "Project") which currently contains an office portion ("Office Portion").

Tenant acknowledges that the Shopping Center has not yet been constructed and that in the course of leasing and constructing the Shopping Center, the same may require reasonable modifications.  As a consequence, the Shopping Center shall be subject to such changes as Landlord's architect or engineer may require, so long as no such change substantially alters the general appearance or relative location of the Premises in the Shopping Center and the amount of floor space in the Premises does not vary by more than ten percent (10%) from that which is set forth above.

201(b).    Term:  The Term of this Lease shall begin on the Lease Commencement Date and continue for a period of three (3) Lease Years after the Rent Commencement Date (as defined in Article 3), unless sooner terminated pursuant to the provisions of this Lease.  The Term may be extended as provided for in Exhibit G.

201(c).    Permitted Use:  The operation of a sit down, full service restaurant & bar and for the incidental provision of carry-out and delivery services in connection therewith, subject to Tenant's Menu attached hereto as Exhibit H and subject to the restrictions and prohibited uses set forth in Exhibit E, and for no other purpose.  Subject to laws, Tenant may, on an incidental basis, sell alcoholic beverages for on-Premises consumption only.

201(d).    Minimum Rent:

| | Annually | Monthly |
|---|---|---|
| Lease Year 1 | $60,000.00 | $5,000.00 |
| Lease Year 2 | $66,000.00 | $5,500.00 |
| Lease Year 3 | $72,000.00 | $6,000.00 |

201(e).    Percentage Rent:  2% of gross sales when operation exceeds $60,000/month in gross sales, after completion of Lease Year 3.

201(f).    Security Deposit:  $10,000.00 due upon execution of this Lease.

201(g).    First Month Rent & CAM:  $6,100.00, payable on or before December 5, 2016.

201(h).    2nd Security Deposit:  $10,000.00 due on or before June 1, 2017.

201(i).    Monthly Common Area Maintenance (CAM) Charge: $1,100.00, subject to adjustment pursuant to this Lease.

201(j).    Monthly Promotional Fund Charge:  None at this time; however, the Landlord reserves the right to start a fund after the plaza is complete.

201(k).    Legal Deposit:  $1,500.00. Refundable at Lease Execution.

201(l).    Estimated Delivery Date:  November 4, 2016

201(m).    Fixturing Period:  0 days. Space is delivered "As Is"

201(n).    Leased Furniture, Fixtures & Equipment ("FF&E"):  As a condition of Lease, Tenant may use all included FF&E, property of Landlord, per Exhibit C-1 of this Lease. All consumable inventory is conveyed to Tenant at no charge or consideration for execution of this Lease.

201(o).    Tenant's Trade Name:  Twisted Cork Grille

201(p).    Minimum Store Hours:
Monday through Thursday 11:00 a.m. to 10:00 p.m.; Friday through Saturday 11:00 a.m. to 10:00 p.m.; Sunday 11:00 a.m. to 9:00 p.m.

201(q).    Landlord's Address for Notices and Rent Payments:
9050 Devlin Road
Bristow, Virginia 20136

201(r).    Tenant's Address:        2918 Saratoga Drive
Winchester, VA 22601

201(s).    Brokers:  None

201(t).    Certificate of Occupancy:  Within ten (10) days after the date that Tenant opens for business in the Premises, Tenant shall provide Landlord with a copy of a Certificate of Occupancy and/or such other document as may be required by the applicable governmental agency in order for Tenant to operate in the Premises.

### EXHIBITS

Attached to this Lease and made a part hereof are the following exhibits.

EXHIBIT A:       Site Plan
EXHIBIT B:       Rules and Regulations
EXHIBIT C:       Construction
EXHIBIT C-1:    Leased Furniture, Fixtures & Equipment ("FF&E")

1

BC 11/7/2016
S:\BC Plaza, LLC\Bristow Commons\Bldg 3\Twisted Cork\Lease 2016\Twisted Cork Lease FINAL.doc

EXHIBIT D:     Sign Criteria
EXHIBIT E:     Prohibited Uses
EXHIBIT F:     Guaranty
EXHIBIT G:     Rider of Additional Lease Provisions
EXHIBIT H:     Tenant's Menu

## ARTICLE 3
### IMPORTANT DATES AND ADDITIONAL DEFINITIONS

301.    **Additional Rent.** All payments of money from Tenant to Landlord required to be paid under this Lease other than Minimum Rent and Percentage Rent. Unless otherwise provided for in this Lease, any Additional Rent shall be due with the next installment of Minimum Rent coming due after Landlord sends a bill or notice regarding the Additional Rent to Tenant.

302.    **Calendar Year.** As used herein, "Calendar Year" or "calendar year" shall mean a period commencing on January 1 and ending on December 31.

303.    **Common Area.** Any existing or future improvements, equipment, areas and/or spaces (as the same may be enlarged, reduced, replaced, increased, removed or otherwise altered by Landlord from time to time) for the non-exclusive, common and joint use or benefit of Landlord, Landlord's invitees, Tenant and other tenants, occupants and users of the Shopping Center. The Common Area may include (not to be deemed a representation of their availability) without limitation sidewalks, parking areas (surface and subsurface), including without limitation any underground storage areas, access roads, driveways, landscaped areas, service drives and service roads, traffic islands, loading and service areas, stairs, ramps, storm water management facilities, and other similar areas and improvements. See Paragraph 1003 regarding cost of completion of the shopping center.

304.    **Date of Lease.** The date set forth in Section 101 above. On such date, all rights and obligations of the parties under this Lease shall commence.

305.    **Day or "day".** A calendar day, unless otherwise expressly set forth to the contrary in a particular provision of this Lease.

306.    **Declaration.** Tenant acknowledges that the Project is subject to the following: (i) Declaration of Covenants, Conditions, Restrictions and Easements dated October 31, 2008, and (ii) the Proffer Statement dated April 29, 2008 collectively, with all of the instruments referenced therein, the "REA"). Notwithstanding anything to the contrary contained in this Lease or elsewhere, Tenant shall comply with the terms of the REA and be responsible for any obligations imposed on the Premises by the REA. This Lease is also subject to any other documents of record.

307.    **Expiration Date.** The last day of the Term.

308.    **Fixturing Period.** The number of days specified in Section 201(m), commencing on the Lease Commencement Date, within which Tenant is obligated to fixture and equip the Premises in accordance with Tenant's Plans as approved in advance by Landlord.

309.    **Landlord Parties.** Landlord, its agents, contractors and employees.

310.    **Landlord's Indemnitees.** Landlord and Landlord's lessors, its partners, officers, shareholders, members, trustees, principals, agents, property managers, employees, contractors and any Mortgagee(s).

311.    **Landlord's Work.** The work, if any, listed in Section I of **Exhibit C**, for performance by Landlord.

312.    **Laws.** All present and future federal, state and local common law, statutes (including without limitation The Americans with Disabilities Act), as amended from time to time, rules, codes, ordinances and regulations, and all directions, requirements, rulings and orders of all federal, state and local courts and other governmental (and quasi-governmental) agencies and authorities including, without limitation, those of any health officer, fire marshal, building inspector or other officials, of the governmental agencies having jurisdiction.

313.    **Lease Commencement Date.** The date (a) Tenant receives Notice of Possession, or (b) on which Landlord would have tendered possession of the Premises to Tenant with Landlord's Work substantially completed but for delays caused in whole or in part by Tenant, as such date is set forth in a notice from Landlord to Tenant. On such date, the utilities shall become Tenant's sole responsibility, and Tenant shall maintain the insurance described in Section 902.

314.    **Lease Interest Rate.** An annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the state in which the Premises is located, or (ii) fifteen percent (15%). Interest shall be calculated on the basis of a 365-day year, actual days elapsed, from the date any cost or expense is incurred until the amount owing (including all interest owing thereon) is fully paid.

315.    **Lease Year.** The first Lease Year shall begin on the Rent Commencement Date and shall end twelve (12) full calendar months thereafter. Thereafter, each Lease Year shall commence on the day following the expiration of the preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter or, if earlier, the Expiration Date.

316.    **Major Tenants.** Those tenants or occupants leasing or occupying space within the Shopping Center which contain a gross leasable floor area of ten thousand (10,000) square feet or more.

317.    **Mortgage.** Any mortgage, deed of trust, security interest or title retention interest affecting the Shopping Center or any portion thereof.

318.    **Mortgagee.** The holder of any note or obligation secured by a Mortgage, including, without limitation, lessors under ground leases, sale-leaseback arrangements and lease-leaseback arrangements.

319.    **Notice of Possession.** Landlord's notice to Tenant that the Premises is ready for Tenant's use and that Landlord has substantially completed Landlord's Work.

320.    **Person.** An individual, firm, partnership, association, corporation, limited liability company, partnership, or any other entity.

321.    **Pro Rata Share.** Tenant's Pro Rata Share shall be a fraction, the numerator of which shall be the gross leasable area of the Premises (as set forth in Section 201(a)) and the denominator of which shall be the gross leasable area of the Shopping Center, exclusive of the gross leasable area of Major Tenants; provided, however, if any Major Tenant contributes to Landlord an amount toward taxes, insurance, common area maintenance costs, or any other pass-through expenses, the amount of such contribution shall be deducted from the total Taxes

2

or Common Area Maintenance Costs for the Shopping Center. Notwithstanding the foregoing, if any tenant of the Shopping Center pays taxes pursuant to a separate tax assessment of its premises, maintains or insures its own parcel, premises or building, maintains any portions of the Common Area at its own expense, or otherwise does not pay to Landlord its full pro rata share of taxes, insurance, common area maintenance costs, or any other pass-through expenses, then the amount of such taxes, maintenance charges, insurance, or other expenses (or portion of any of the foregoing) paid by such tenant shall not be included in Taxes or Common Area Maintenance Costs (except to the extent any pass-through expenses are payable by such tenant to Landlord), and such tenant's premises shall not be included in the gross leasable area in the Shopping Center for purposes of computing Tenant's Pro Rata Share of such item. Space contained in any basement area or mezzanine area of the Shopping Center, such as a projection room in a movie theater or storage space located in a mezzanine of a space, shall not be included in computing gross leasable area of the Shopping Center, but basement area or mezzanine area used for retail sales or used in determining parking requirements for the Shopping Center shall be included.

322.    Rent. All amounts that Tenant is obligated to pay under this Lease, including, without limitation, Additional Rent, Minimum Rent, Percentage Rent, Monthly Tax Charges, Monthly Common Area Maintenance Charge, and Monthly Promotional Fund Charges (if applicable).

323.    Rent Commencement Date. The next day after the last day of the Fixturing Period or the date Tenant opens for business, whichever is earlier, shall be the commencement date of Tenant's obligations to pay Rent and submit statements of Gross Sales pursuant to Article 7 below. Notwithstanding anything to the contrary herein, no rent, as defined as defined in Section 322 above, shall commence until December 5, 2016, and in accordance with Section 201(g) of this Lease.

324.    Tax Year. A twelve (12) month period established by Landlord as the year for purposes of computing Tenant's Pro Rata Share of Taxes. The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Shopping Center.

325.    Tenant Parties. Tenant, its agents, contractors, and employees, and while in the Premises, invitees.

326.    Tenant's Work. The work to be performed by Tenant, at Tenant's sole cost, in accordance with Exhibit C and the Tenant Plans.

327.    Term. As used in this Lease "Term" or "term" shall include the Term described in Section 201(b), and where applicable any extension of the Term. As used in this Lease "Extension Term" or "extension term" means any option period or other permitted extension of the Term.

## ARTICLE 4
## POSSESSION

401.    Condition of the Premises. Landlord shall complete Landlord's Work. Except for completion of such Landlord's Work, Tenant accepts the Premises in "as is" condition. Tenant expressly acknowledges that except as expressly provided for in this Lease, Landlord makes no representations or warranties regarding the Premises or the suitability of the Premises for Tenant's business.

402.    Commencement of Tenant's Work. Upon the Lease Commencement Date, Tenant shall with due diligence proceed to install such fixtures and equipment and to perform all of Tenant's Work as shall be required pursuant to Tenant's Plans (as defined in Section 1401 hereof), as approved in writing by Landlord. Tenant's Work shall be in compliance with Part II of Exhibit C. Tenant agrees that it will use all existing fixtures in the Premises. It shall be an Event of Default under this Lease if Tenant occupies the Premises or installs an exterior sign prior to the Lease Commencement Date without Landlord's prior written consent.

403.    Failure to Open for Business. If Tenant does not open the Premises for the conduct of its business by December 15, 2016, then in order to compensate Landlord for its loss, Landlord, in addition to all other remedies it may have hereunder, shall have the option of (a) terminating this Lease by giving Tenant notice of such termination, whereupon this Lease shall terminate for all purposes and in all respects, or (b) collecting from Tenant an amount equal to all Rent due under this Lease, plus an additional amount (which shall constitute Additional Rent under this Lease) of twelve percent (12%) of the monthly Minimum Rent per day for each and every day from the Rent Commencement Date until the date Tenant opens for business from the Premises in accordance with the terms of this Lease.

404.    Delivery Failure. If Tenant is unable to obtain possession of the Premises on or before the Estimated Delivery Date due to any act or condition beyond Landlord's reasonable control (including, but not limited to, the failure of any existing tenant to vacate the Premises (or any part thereof)), Landlord shall not be liable for any loss, damage or cost resulting therefrom, and this Lease shall not be affected thereby in any way; provided, however, that if the Premises are not available for Tenant's possession within ninety (90) days after the Estimated Delivery Date, Landlord may terminate this Lease by giving Tenant written notice thereof within ten (10) days after the lapse of said ninety (90) day period.

405.    Quiet Enjoyment. Landlord covenants and agrees that so long as Tenant has not committed an Event of Default, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject to the terms and conditions of this Lease, any Mortgage, and all matters of record, or any other agreements to which this Lease is or may hereafter be subordinated.

## ARTICLE 5
## USE

501.    Permitted Use. Tenant shall continually use and occupy the entire Premises at all times during the Term solely for the Permitted Use, only under the Tenant's Trade Name and only in accordance with the uses permitted under applicable zoning and other applicable governmental regulations and requirements and for no other purpose or under any other name, unless otherwise approved in advance in writing by Landlord. It is agreed that the Permitted Use specified in Section 201 has been, and is, a material inducement to Landlord in entering into this Lease with Tenant, and that Landlord would not enter into this Lease without this inducement. Furthermore, and without limiting the generality of the preceding sentence, Tenant shall not use the Premises for any of the purposes prohibited in Exhibit E or for any future use restriction that may exist in the Project of which Tenant has prior written notice, including, but not limited to, any use restriction contained in the REA (and which future use restriction does not conflict with Tenant's Permitted Use). Tenant shall not offer any goods or services which Landlord determines, in its sole and reasonable discretion, to be inconsistent with the image of a first-class, family-oriented regional retail development, nor shall Tenant display or sell any goods, nor distribute any handbills or advertising, containing portrayals which Landlord determines, in its reasonable discretion, to be lewd, graphically violent or pornographic. Tenant shall not advertise any other business or service in the Premises which is not directly in connection with the Permitted Use.

502.    Continuous Use. Upon the Rent Commencement Date and at all times thereafter during the Term, Tenant shall continuously and uninterruptedly operate its business from the entire Premises for the Permitted Use in good faith, fully staffed and merchandised so as to maximize its sales volume during all hours of operations, as may be set from time to time by Landlord, and shall remain open for business at least during the Minimum Store Hours set forth in Section 201. Tenant shall conduct no distress sales, such as "going-out-of-business", "lost-our-lease", fire or bankruptcy sales on the Premises or elsewhere in the Shopping Center. Tenant expressly acknowledges that the failure of Tenant to operate the Premises in accordance with this Section 502 shall constitute an Event of Default under this Lease giving rise to all

3

remedies provided in this Lease and/or available at law or in equity to Landlord, and Landlord shall be entitled, among its other remedies, to enjoin the removal from, or discontinuance of Tenant's business at, the Premises by seeking injunctive relief or other appropriate remedy.

503.   **Storage and Office Space.** Tenant shall store or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from, or upon the Premises. This shall not preclude occasional emergency transfers of merchandise to the other stores of Tenant, if any. Tenant shall use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required for Tenant's business therein, and Tenant shall not perform any office or clerical function in the Premises for any store located elsewhere.

## ARTICLE 6
## TERM

601.   **Lease Term.** The Term of this Lease shall commence on the Lease Commencement Date and shall end at midnight on the Expiration Date without the necessity of any notice from either party to the other to terminate the same. Tenant hereby waives notice to vacate the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting summary recovery of possession from a tenant holding over to the same extent as if any statutory notice had been given.

602.   **Survival of Obligations.** All obligations to perform any action and/or pay any sums due or to become due to either party from the other under this Lease shall survive the expiration or earlier termination of this Lease and remain continuing obligations until performed and/or paid. All indemnity obligations under this Lease shall likewise survive the expiration or earlier termination of this Lease.

## ARTICLE 7
## RENT

701.   **Payment of Rent.** Tenant covenants to pay Landlord at the address for Rent Payments set forth in Section 201(g), the Minimum Rent in the sums set forth in Section 201(d) above and in Exhibit G, Paragraph 1, and the Monthly Tax Charge, Monthly Common Area Maintenance Charge, and Monthly Promotional Fund Charge (if applicable), in advance on the first day of each calendar month during the Term, without offset, deduction, abatement, counterclaim, recoupment or notice or demand therefor. Rent checks shall be made payable to Landlord, or to such other entity directed by Landlord. Rent shall commence to accrue on the Rent Commencement Date. The first full monthly payment of Rent shall be paid as the Rent Deposit upon execution of this Lease. The next payment of Rent shall be due on the first day of the first full month of the Term for a pro-rated amount of the Minimum Rent and Additional Rent applicable to the period from the Rent Commencement Date to the last day of the month in which the Rent Commencement Date occurred; provided, however, if the Rent Commencement Date occurs on the first day of a month, then Tenant's next payment of Rent shall be due and payable on the first (1st) day of the next full calendar month thereafter. For the full calendar year, Lease Year or Tax Year in which the Term commences and terminates, Tenant's liability for Tenant's Pro Rata Share of Taxes, Common Area Maintenance Charges, and Promotional Fund Charges (if applicable) shall be subject to a pro rata adjustment based on the number of days of said calendar year, Lease Year or Tax Year, as applicable, during which the Term of this Lease is in effect.

702.   **Percentage Rent.** For each Lease Year or portion thereof after the Initial Term, Tenant covenants to pay Percentage Rent in the amount calculated in accordance with Section 201(e), which shall be in addition to Minimum Rent and Additional Rent. There shall be no abatement, apportionment or suspension of the Percentage Rent payable hereunder except as provided for herein. Commencing with the first (1st) Lease Year of the Term, and continuing throughout the remainder of the Term, the amount of Percentage Rent due under this Lease shall be calculated and shall be payable on or before the thirtieth (30th) day after the end of each Lease Year or portion thereof. The first (1st) payment of Percentage Rent due hereunder shall include all Gross Sales (as defined below) from the Rent Commencement Date through the close of the first Lease Year. Notwithstanding anything herein contained to the contrary, at Landlord's request, payment of Percentage Rent shall be made by Tenant to Landlord on a monthly basis for the preceding month on the fifteenth (15th) day of each month in each Lease Year following the month in which Tenant's Gross Sales for such Lease Year (computed from the beginning thereof) have reached the volume of Gross Sales at which Tenant is required to pay Percentage Rent for such Lease Year.

703.   **Gross Sales.** Percentage Rent shall be determined (as provided in Section 201(e) above) based on "Gross Sales" which, as such term is used herein, shall be construed to include the entire amount of the actual receipts, whether for cash or otherwise, of all sales of merchandise, service or any other receipt whatsoever of all business conducted at, in, from, about, or upon the Premises, including, but not limited to, mail orders, telephone orders, internet orders, and/or other orders in whatever manner received, placed or filled, whether in whole or in part, at the Premises, and including all deposits not refunded to purchasers, orders taken (although said orders may be filled elsewhere), sales to employees, sales through vending machines or other devices, and sales by any subtenant, concessionaire or licensee or otherwise at, in, from, about or upon the Premises, provided that nothing herein shall (a) prevent Landlord from requiring an additional or different Percentage Rent as a condition to approval of any subtenant, concessionaire or licensee hereunder, or (b) permit Tenant to sublet the Premises or grant any license or concession except as expressly permitted pursuant to the terms of Article 23. No deduction shall be allowed for (i) uncollected or uncollectible accounts, (ii) any income or similar tax based on income, (iii) any gross receipts tax, or (iv) any cash or credit refund given for any sale made via the Internet and not originating with an Internet order placed in the Premises. Each sale upon installments or credit shall be treated as a sale for the full price in the month during which such sale is made, irrespective of the time when Tenant shall receive payment therefor. Gross Sales shall not include (i) any sales tax, use tax, or any other tax separately collected by Tenant and paid to any duly constituted governmental authority, (ii) the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which had theretofore been made at, in, from, about or upon the Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from, about or upon the Premises, (iii) the amount of returns to shippers or manufacturers, and (iv) sales of Tenant's store fixtures which are not a part of Tenant's stock in trade and which Tenant has a right to remove from the Premises. Tenant may deduct from Gross Sales the actual net amount of refunds, credits or allowances made or allowed by Tenant in accordance with reasonable business practices upon transactions previously included within Gross Sales (not exceeding in amount the selling price of the item in question) where the item is returned by the purchaser and accepted by Tenant (provided that anything given in exchange for returned items and any such credits to customers shall be included in Gross Sales).

Tenant's right not to include the items set forth (in Sections i through iv) above in Gross Sales shall be subject to the condition that Tenant shall furnish to Landlord together with Tenant's annual statement of Gross Sales an itemization by category of the total amount not included within Gross Sales. Tenant shall maintain itemized records in accordance with generally accepted accounting principles ("GAAP") in connection with each category as permitted hereunder.

704.   **Radius.** During the Term, neither Tenant nor Tenant's management, nor any person or entity controlled by Tenant or controlling Tenant, or controlled by the same person or entity or persons or entities who control Tenant, shall own, operate or maintain, or have any significant affiliation, investment or interest, directly or indirectly, through or with any other person, partnership, corporation, agent or employee in any similar or competing business as that being operated at the Premises, within a radius of three (3) miles from the outside boundary of the Shopping Center (which distance shall be measured in a straight line without reference to road mileage). Tenant acknowledges that Landlord's obtaining a fair and equitable rent for the Premises under this Lease is dependent upon Tenant concentrating its business efforts within the geographical area in which the Shopping Center is located so as to maximize Gross Sales. Tenant further acknowledges that any activity by Tenant within such geographical area in operating or participating in the operation of a similar or competing business shall necessarily have an adverse effect on the volume of Gross Sales by Tenant at the Premises to the detriment of Landlord and will deprive

4

Landlord of the fair rent to which the parties have agreed. Accordingly, if during the Term there is a breach of the covenant set forth in the first sentence of this Section 704, then Gross Sales of any such other place of business (using the definition of Gross Sales set forth herein as if such definition referred to such other place of business) shall be added to the Gross Sales made from the Premises to determine the Percentage Rent due under this Lease, as fully as though the gross receipts from such other business had actually been made from the Premises. In such event, all of the provisions of this Article 7 shall be applicable to the gross receipts of, and all the books and records pertaining to, such competing store(s). In lieu of adding the gross receipts of such other business to Gross Sales, Landlord shall have the right, in its sole discretion, to charge Tenant an amount equal to Three Dollars ($3.00) per square foot of the Premises per Lease Year, as liquidated damages, pro-rated on a monthly basis for so long as such default continues, which additional amount shall be deemed to be liquidated damages for Tenant's breach of this provision (and not a penalty) and shall be Additional Rent, payable at the same time Minimum Rent is due under this Lease.

**705.    Monthly Statement.** Within ten (10) days after the end of each calendar month after the Initial Term, Tenant shall submit to Landlord a complete statement showing the amount of Gross Sales from the Premises (and from such other business as may be required pursuant to Section 704 above) during said calendar month. If Tenant fails to timely deliver the statements required by this Section 705, Tenant shall pay to Landlord a late charge in accordance with Section 2610 below.

**706.    Annual Statement.** Within forty-five (45) days after the expiration of each Lease Year after the Initial Term, Tenant shall deliver to Landlord a written statement certified without material qualification by the independent certified public accountant regularly retained by Tenant, or such other firm or accountant as may be approved in advance in writing by Landlord, setting forth the amount of Tenant's Gross Sales for such Lease Year. All such statements of Gross Sales shall list as separate amounts (a) Gross Sales upon which Percentage Rent shall be computed and (b) other categories of receipts not subject to Percentage Rent. If the accountant's certification does not verify the amount of Gross Sales for any Lease Year, Tenant shall deliver to Landlord, together with the conflicting accountant's certification, a written statement by the accountant who prepared such certification explaining the discrepancy. If the statement submitted pursuant to this Section 706 indicates total Gross Sales for the Lease Year differing from the amounts reported on the monthly statements submitted for such Lease Year, the amount of such difference shall be subject to the following, as applicable: (a) if the aggregate amount set forth on the monthly statements submitted by Tenant is less than the amount shown on the audited annual statement, any underpayment of Percentage Rent caused thereby shall be paid by Tenant to Landlord within fifteen (15) days after delivery of such statement by Tenant to Landlord, or (b) if the aggregate amount set forth on the monthly statements submitted by Tenant is greater than the amount shown on the audited annual statement, any overpayment of Percentage Rent caused thereby shall be credited by Landlord against the next installment or installments of Percentage Rent due under this Lease. Tenant shall require its subtenants, concessionaires, and licensees, if any, to furnish similar monthly and annual statements to Tenant within the same periods specified in Sections 705 and 706. For the last Lease Year, the statements of Gross Sales shall end with the expiration or termination of this Lease. If Tenant fails to timely deliver the reports required by this Section 706, Tenant shall pay Landlord a late charge in accordance with Section 2610 below.

**707.    Books and Records.** After the Initial Term, Tenant shall record at the time of each sale or other transaction, in the presence of the customer, all receipts from sales or other transactions whether for cash or credit in a cash register or in cash registers sealed in a manner approved by Landlord and having such other features as shall be approved by Landlord. Tenant shall keep on the Premises for three (3) years following the end of each Lease Year adequate records in keeping with GAAP evidencing inventories and receipts of merchandise at the Premises, the gross income, sales and tax returns with respect to such Lease Years at or from the Premises and all pertinent original sales records, which shall include: (a) cash register tapes, including tapes from temporary registers; (b) serially numbered sales slips; (c) the originals of all mail orders at and to the Premises; (d) the original records of all telephone orders at and to the Premises; (e) settlement report sheets of transactions with subtenants, concessionaires and licensees; (f) the original records showing that merchandise returned by customers was purchased at the Premises by such customers; (g) memorandum receipts or other records of merchandise taken out on approval; (h) such other sales records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales and (i) the records specified in (a) through (h) above of any other persons conducting business upon or from the Premises, including without limitation, subtenants, assignees, concessionaires, or licensees. Landlord and Landlord's authorized representatives shall have the right to examine the foregoing records during reasonable business hours.

**708.    Audit.** After the Initial Term, Landlord shall have the right to have an audit made of Tenant's books and records pertaining to all receipts and Gross Sales from any business conducted from, on or about the Premises. Tenant shall promptly pay Landlord any deficiency found in Tenant's payment of Percentage Rent. If any statement required by Section 704, 705, 706 or 707 above is found to differ by more than two percent (2%) from the audited amount, Tenant shall also pay for any and all costs and fees of such audit within fifteen (15) days after notice from Landlord, and if such audit proves such statements to be correct, or such statements collectively do not vary by more than two percent (2%) from the results of the audit, then the expenses of such audit shall be borne by Landlord.

**709.    Insufficient Records.** If after the Inial Term, Landlord is unable to conduct a proper examination and/or audit pursuant to Section 708 above due to Tenant's failure or inability to produce adequate records, the parties agree that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, will suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right, at its option, to collect, as liquidated damages (and not as a penalty), in addition to all Rent payable hereunder and in addition to all other rights and remedies under this Lease, an amount equal to twenty percent (20%) of the greater of (i) Percentage Rent reported for the period or periods in question or (ii) the Minimum Rent payable for the period or periods in question.

**710.    Manner of Payment.** Tenant shall promptly pay, to the entity and at the location directed by Landlord, all Rent and other payments called for herein when and as the same shall become due and payable, in lawful money of the United States, without offset, deduction, recoupment, or notice or demand therefor. Rent checks shall be made payable and sent to Landlord's address, as set forth in Section 201, or as otherwise designated by Landlord in writing. Any check received by Landlord shall be deemed received subject to collection. Any payments of Rent by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account and may be applied in Landlord's sole and reasonable discretion. The acceptance by Landlord of payment of a lesser amount with or without an endorsement or statement thereon, or upon any communication accompanying such payment, that such lesser amount is payment in full, shall be given no effect, and shall not constitute an accord and satisfaction or settlement, and Landlord may accept and apply such payment without prejudice to any rights or remedies which Landlord may have. If on more than one (1) occasion during the Term any check for Rent shall not be honored by the bank on which it is drawn, Landlord may thereafter require that all future payments from Tenant be made by certified check, cashiers' check, or immediate funds. In addition, Landlord may assess a One Hundred Dollar ($100.00) charge for any check from Tenant returned to Landlord for insufficient funds.

Landlord reserves the right, if there has been a late payment of Rent, per Section 322 of this Lease, to require Tenant to pay Rent and other charges then due under this Lease by, at Landlord's sole election, direct debit or electronic funds transfer (or similar technology) via the Automated Clearing House (ACH) electronic network (or similar network) (herein referred to as "Electronic Payment"). Within three (3) days of Landlord's request, Tenant shall register for Electronic Payment and provide to Landlord such information as is reasonably required to establish Electronic Payment such as, without limitation, an authorization form and voided check. If the Electronic Payment fails as a result of insufficient funds in Tenant's account, then Tenant shall be responsible for any insufficient funds charges, returned draft fee charges and/or similar charges, and the full amount of any Rent and other charges then due shall immediately be paid by Tenant to Landlord in certified funds. Regardless of the then required payment method, Landlord hereby reserves all rights and remedies available to it under this Lease, at law or in equity for Tenant's failure to pay Rent and other charges when due.

5

711.    **Late Payment.** If any payment of Rent is not received by Landlord within three (3) days after its due date, Tenant shall be immediately obligated to pay, as Additional Rent, a late charge equal to five percent (5%) of the amount due, to compensate Landlord for the additional administrative expense and inconvenience occasioned thereby, which late charge shall be due within ten (10) days after written demand therefor by Landlord.

## ARTICLE 8
### TAXES

801.    **Tax Definition.** Tenant covenants to pay Landlord, as Additional Rent, Tenant's Pro Rata Share of all Taxes. As used in this Lease, "Taxes" means and includes without limitation, all ad valorem taxes, sewer taxes, front-foot benefit charges (public or private), school taxes, real estate taxes, special and general assessments; water and sewer rents and charges; governmental license and permit fees; charges for public or private easements benefiting the Shopping Center; taxes on other areas made available for the common use or benefit of tenants; and all other governmental impositions and charges (extraordinary as well as ordinary, foreseen and unforeseen) which during the Term are either a lien on the Shopping Center or which are charged, levied or assessed on, or imposed in connection with, the use, occupancy or possession of the Shopping Center, and/or which appear as a charge on a tax bill given to Landlord by any official taxing authority; any other taxes, assessments or charges in the manner of taxes, which Landlord shall be obligated to pay arising out of the use, occupancy, ownership, leasing, management, repair or replacement of the Shopping Center (e.g. taxes, license fees or other charges measured by the rents receivable by Landlord from the Shopping Center; occupancy taxes, Landlord's business, professional and occupational tax, or similar taxes; interest on Tax installment payments paid over a period of more than one (1) year); and, if Landlord contests Taxes or seeks a reduction of the same, any and all costs, expenses and fees (including attorneys' and other experts' fees) incurred by Landlord in reviewing, initiating, appealing, contesting and/or negotiating Taxes with the public authorities (regardless of the outcome). Taxes shall also include impositions payable by Landlord, including payments in lieu of Taxes, under any arrangement with governmental authority. If any governmental authority or unit under any present or future law effective at any time during the Lease Term hereof shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Shopping Center or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of the Shopping Center, such tax shall be paid by Tenant, either directly or through Landlord. Tenant shall not be required to pay (i) any municipal, county, state or federal income tax, (ii) any inheritance, estate, succession, transfer, franchise, corporation, net income or profit tax or capital levy imposed upon Landlord, or (iii) any special assessments which are levied or assessed by a special assessment district which is formed, directly or indirectly, by Landlord and/or others for the purpose of constructing or acquiring on-site or off-site improvements to or for the Shopping Center, or any portion thereof. A copy of an official tax bill with respect to a governmental tax or assessment shall be conclusive evidence of the amount of a Tax.

802.    **Tax Payment.** Tenant covenants to pay Landlord, as Additional Rent, Tenant's Pro Rata Share of Taxes to Landlord in the form of the Monthly Tax Charge, at the same time as Minimum Rent is payable hereunder, without offset, deduction, recoupment, counterclaim, abatement, notice or demand. The Monthly Tax Charge set forth in Section 201, annualized, shall be the initial estimated charge payable by Tenant for Real Estate Taxes. Following receipt of all tax bills and assessment bills attributable to any Tax Year during the Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Pro Rata Share of Taxes for such year. If the total amount paid by Tenant is different than the actual amount owed, there shall be an appropriate adjustment, with payment being made by the applicable party to the other within fifteen (15) days after receipt of the statement. Landlord may provide any refund in the form of a credit against the next installment or installments of Taxes due from Tenant to Landlord hereunder, or by refund if there is insufficient time remaining in the Term to apply such credit, provided, however, if an Event of Default exists then Tenant shall not be entitled to any refund or credit of such amounts and Landlord may apply any overpayment to outstanding amounts due from Tenant to Landlord under this Lease. If at any time the Taxes increase, Landlord may increase the Monthly Tax Charge accordingly to reflect Tenant's Pro Rata Share of such increase. Landlord's agreement to provide a statement as provided for in this Section is not a condition to the Tenant's obligation to make payment of the Tenant's Pro Rata Share of Taxes.

## ARTICLE 9
### INSURANCE

901.    **Landlord's Insurance.** Landlord shall provide property, liability, and/or such other insurance coverages as Landlord, in its sole and reasonable discretion, deems appropriate for the Shopping Center. Landlord's cost for such insurance shall be included as part of the Shopping Center's Common Area Maintenance Costs for which Tenant is obligated to pay its Pro Rata Share pursuant to Article 10.

902.    **Tenant's Insurance.** Tenant covenants and agrees that during the Term, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance in the amounts specified and in the form hereinafter provided for:

        (a) **Commercial General Liability.** Commercial general liability insurance (at least as broad as Insurance Services Office, Inc. (ISO) form CG 00 01 10 01 or equivalent occurrence basis commercial general liability insurance policy form that is reasonably satisfactory to Landlord) with general liability insurance containing coverage in the amounts of $1,000,000 per occurrence, $2,000,000 annual aggregate, and $2,000,000 Products and Completed Operations Aggregate, plus an excess/umbrella liability policy containing a per occurrence limit of $3,000,000. Said insurance shall cover any and all liability of the insured with respect to said Premises, the areas adjacent to the Premises (including, but not limited to, the sidewalk and loading dock), or arising out of the maintenance, use or occupancy thereof. All such insurance shall specifically insure the performance by Tenant of the indemnity provisions as to liability for injury to or death of persons and injury or damage to property contained in this Section 902. Tenant shall also maintain Workers' Compensation coverage in accordance with statute. Tenant's commercial general liability insurance shall name Landlord, Landlord's agent, if any, Landlord's Mortgagee(s) and any other designee of Landlord, as additional insureds (using ISO Form CG 2010 (11/85), or equivalent). The amount of such liability insurance required to be maintained by Tenant hereunder shall not be construed to limit Tenant's indemnity obligations in this Lease or other liability hereunder.

        (b) **Glass.** Tenant shall be responsible for the maintenance of all glass in or on the Premises and shall insure the risk.

        (c) **Tenant Improvements.** Insurance covering all of the items specified as "Tenant's Work," Tenant's leasehold improvements, betterments, trade fixtures, furniture, merchandise, inventory and personal property from time-to-time in, on or upon the Premises, and personal property of others in Tenant's possession, in an amount not less than the full replacement cost without deduction for depreciation from time-to-time during the Term of this Lease, providing protection against any peril included within the classification causes of loss-special form, together with insurance against water damage, vandalism and malicious mischief. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed.

        (d) **Automobile Liability Insurance.** Tenant shall also maintain business automobile liability insurance on all vehicles that Tenant owns or leases and shall carry hired and non-owned liability insurance if there are no automobiles owned by Tenant, all of which shall be subject to a minimum limit of One Million Dollars ($1,000,000.00). This paragraph shall not be construed as granting permission to Tenant to park any automobiles overnight at the Premises without the consent of Landlord, which shall be in the Landlord's sole and absolute discretion.

        (e) **Business Income Insurance.** Business income insurance (formerly known as "business interruption insurance") in an amount equal to the annual Rent for a twelve (12) month period.

        (f) **Worker's Compensation.** Worker's Compensation insurance meeting the requirements of the state worker's compensation laws and employer liability insurance in an amount not less than One Million Dollars ($1,000,000.00).

6

(g) **Contractors Insurance.** Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord: (a) commercial general liability insurance, including contractors liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, providing protection with limits for each occurrence of not less than Two Million Dollars ($2,000,000); and (b) workers' compensation or similar insurance in form and amounts required by any Laws.

(h) **Dram Shop.** If dram shop liability is recognized in the state in which the Premises is located, Tenant shall maintain "dram shop or "liquor legal liability" insurance if Tenant sells alcoholic beverages, either as an endorsement to its general liability policy or as a separate policy. Tenant shall provide Landlord with evidence of this insurance prior to selling or serving alcoholic beverage at or from the Premises.

(i) **Environmental Insurance.** If Tenant uses or stores any flammable or toxic chemicals in the course of its business or if otherwise requested by Landlord, Tenant shall purchase and maintain Environmental Legal Liability including coverage for pollution clean-up with a limit of not less than One Million Dollars ($1,000,000).

(j) **Other Insurance.** Tenant shall, at its sole cost and expense, keep in full force and effect during the Term such other insurance coverage against other insurable hazards as are from time to time reasonably requested by Landlord. The minimum limits of coverage as set forth in this Article 9 may from time to time, at Landlord's sole discretion, be reasonably increased in a manner consistent with industry standards. Within thirty (30) days after Landlord's written notice of such additional or increased insurance requirements, Tenant shall provide Landlord with copies of certificates or policies of insurance evidencing such change(s).

(k) **Policy Form.** All policies and certificates of insurance shall evidence that Tenant's insurance policies required pursuant to the provisions of this Lease (i) name Tenant as the insured; (ii) contain a standard mortgagee endorsement satisfactory to Landlord and Landlord's Mortgagee(s); (iii) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord or any other party is excess and is non-contributing with the subject insurance coverage; (iv) contain cross-liability coverage or a severability of interest clause in a commercially reasonable form; (v) provide that an act or omission of one of the insureds or additional insureds thereunder which would void or otherwise reduce coverage, shall not void or reduce coverage as to the other insureds or additional insureds; (vi) provide that the insurer thereunder waives any right of recovery by way of subrogation against Landlord and the Landlord Indemnitees (as defined in Article 3) in connection with any loss or damage covered by such insurance policy; (vii) not contain any deductible provision in excess of Ten Thousand Dollars ($10,000); (viii) initially be for a term of one (1) year and shall contain an endorsement prohibiting cancellation, modification or reduction of coverage without first giving the additional insureds at least thirty (30) days prior written notice of such proposed action; and (ix) be in commercially reasonable form. Such policies shall be for the mutual and joint benefit and protection of Landlord, Tenant and others mentioned above, and executed copies of such policies of insurance or certificates (on Accord Form 27 and 28, as applicable, or substitute equivalents if no longer available) thereof shall be delivered to Landlord on or before the Lease Commencement Date and at least forty five (45) days prior to the expiration of any insurance policy. All insurance carriers providing insurance required by this Section 902 must have no less than an A.M. Best's A-/X rating.

(l) **Failure of Tenant to Obtain.** If certificates of insurance required pursuant to this Article 9 are not received by Landlord on or before the Lease Commencement Date, (i) Tenant shall not be permitted to perform any work on the Premises or otherwise use or occupy the Premises until such certificates are received by Landlord, and (ii) Landlord shall have no obligation to deliver the keys to the Premises to Tenant until such certificates are received by Landlord; provided, however, the Lease Commencement Date shall not be affected and the Fixturing Period shall be deemed to begin on the Lease Commencement Date. In addition, if Tenant fails to timely provide such insurance policies or certificates (or revised policies or certificates as described in this Section 902), Tenant shall pay to Landlord, upon demand and in addition to any other rights and remedies of Landlord hereunder, a late charge pursuant to Section 2610 below, and Landlord shall have the right, (but not the obligation) without notice to Tenant and at any time and from time to time, to acquire such insurance, and Tenant shall be obligated to pay Landlord, as Additional Rent, the amount of the premium and all sums incurred by Landlord applicable thereto within five (5) days following notice from Landlord.

(m) **Blanket Policy.** Notwithstanding anything to the contrary contained within this Article 9, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided however, that Landlord and others mentioned above shall be named as an additional insured thereunder as their interests may appear and that the coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance, and provided further, that the requirements set forth herein are otherwise satisfied. Tenant agrees to permit Landlord at all reasonable times to inspect the policies of insurance of Tenant covering risks upon the Premises for which policies or copies thereof are not required to be delivered to Landlord.

**903. Increased Insurance Risk.** Tenant agrees that it will not at any time during the Term of this Lease, carry any stock or goods or do anything in or about the Premises, increases the insurance premium upon the Shopping Center. Tenant agrees to pay to Landlord, within thirty (30) days after demand therefore the amount of such increase, whether or not Landlord shall have consented to such act or condition on the part of Tenant. If Tenant installs upon the Premises any electrical equipment which constitutes an overload on the electrical lines of the Premises, Tenant shall at its own expense make whatever changes are necessary to comply with the requirements of the insurance underwriters and any governmental authority having jurisdiction over the Premises, but nothing herein contained shall be deemed to constitute Landlord's consent to such overloading.

**904. Compliance.** Tenant shall comply with all requirements and recommendations of Landlord's insurance carriers. In case of breach of this covenant, in addition to all other remedies of Landlord hereunder, Tenant shall pay to Landlord, as Additional Rent, any and all increases in premiums for insurance carried by Landlord where such increases were caused in any way by the occupancy or use of Tenant or the condition of the Premises.

**905. Indemnification.** Tenant shall indemnify, defend and hold Landlord Indemnitees harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Landlord Indemnitees and arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the acts or negligence of the Tenant Parties, (iii) any loading platform area for Tenant's exclusive use from the Premises, and/or (iv) the use or occupancy of the Premises by the Tenant Parties. If any action or proceeding is brought against any of the Landlord Indemnitees by reason of any of the foregoing, Tenant's insurance company shall defend the Landlord Indemnitees by counsel chosen by Tenant's insurance company. If Tenant's insurance company declines to defend the Landlord Indemnitees, Tenant shall reimburse the Landlord Indemnitees the reasonable cost of defending such action or proceeding. Any such cost, damage, claim, liability or expense incurred by Landlord Indemnitees for which Tenant is obligated to reimburse Landlord Indemnitees under this Lease shall be deemed Additional Rent due and payable within five (5) days after notice to Tenant that payment is due.

**906. Release of Claims.** To the maximum extent permitted by law, the Landlord Indemnitees shall not be liable for, and Tenant waives all claims for, loss or damage to Tenant's business or injury or damage to person or property sustained by Tenant, or any person claiming by, through or under Tenant, resulting from any accident or occurrence in, on or about the Shopping Center, including without limitation claims for loss, theft, injury or damage resulting from: (i) any equipment or appurtenances being or becoming out of repair; (ii) wind or weather; (iii) any defect in or failure to operate any sprinkler, HVAC equipment, electric wiring, gas, water or steam pipe, stair, railing or walk; (iv) broken glass;

JJC 11/9/16

billing by Landlord, Tenant's allocated share of all costs incurred by Landlord in connection with Tenant's being open during the After Hour Period, including, without limitation, the costs of lighting the parking lot and security, if provided (collectively, the "After Hour Cost"). For purposes of this clause, Tenant's allocated share of the After Hour Cost shall be a fraction with a numerator that shall be the Tenant's of the Premises and a denominator that shall be the leased area of all tenants, including the Tenant, that are open during the After Hour Period, weighted by the number of extended hours of such tenants' operations.

**1005.    Employee Parking.** Tenant, Tenant's employees and employees of any permitted concessionaires or other occupants of the Premises shall not park their vehicles in any parking spaces in the Shopping Center other than as designated from time to time by Landlord as employee parking. Within five (5) days after Landlord's request, Tenant shall furnish to Landlord the license plate numbers and description of the vehicles operated by Tenant and its employees and permitted concessionaires or other occupants and Tenant shall notify Landlord of any changes in such information within five (5) days after such changes occur. Tenant shall not interfere with the rights of Landlord and other tenants, and their respective permitted concessionaires, officers, employees, agents, licensees and invitees, to use any part of the parking areas or any other portion of the Common Area. Landlord reserves the right to tow vehicles in violation of this Section 1005.

## ARTICLE 11
## PROMOTIONAL FUND

**1101. Promotional Fund Charge.** After the Shopping Center is completed, or upon mutual agreement between Tenant and Landlord, Tenant covenants and agrees to participate in the promotional fund established by Landlord to furnish and maintain advertising, marketing and sales promotions for the benefit of the Shopping Center (the "Promotional Fund"). After the Initial Term, Tenant shall pay to Landlord on a monthly basis, the Monthly Promotional Fund Charge, which shall be the minimum charge payable by Tenant to the Promotional Fund each month. The amount of such Promotional Fund Charge shall be increased each subsequent Lease Year at the Landlord's option to an amount not to exceed one hundred five percent (105%) of the Promotional Fund Charge for the immediately preceding Lease Year. The Promotional Fund Charge will not exceed $0.50/SF annually in the first year after the Initial Term.

**1102. Use of Funds; Merchant's Association.** The funds contributed by Tenant as provided herein shall be used by Landlord for the promotion and benefit of the Shopping Center in such manner as Landlord shall from time to time determine. Landlord, at its option, may pay any part of the amount received hereunder to the Merchants Association which has been or may be formed in the Shopping Center, and any such payment shall be deemed to be an expenditure of such sums for the promotion and benefit of the Shopping Center. In the event a Merchant's Association is created, Tenant shall become a member of the Merchant's Association, and shall, in lieu of making a contribution to the Promotional Fund, pay as dues therefore an amount equal to, and in the same manner, as the amount which would have been paid to the Promotional Fund as provided for above. Upon creation of a Merchant's Association, Landlord shall have the right to disband the Promotional Fund.

**1103. Landlord's Rights and Obligations.** Nothing in the Lease shall be construed as a representation that Landlord has or will establish a Promotional Fund or Merchant's Association. Landlord reserves the right and option, at any time and from time to time, to alternatively establish a Promotional Fund and/or Merchant's Association.

**1104. Advertising.** In all advertising and promotional efforts undertaken by Tenant, Tenant must indicate its tenancy at the Shopping Center, reflecting the complete name and address of the Shopping Center.

## ARTICLE 12
## DEPOSITS

**1201.    Security and Rent Deposit.** Tenant shall pay Landlord the Security Deposit, per Section 201(f), upon execution of this Lease and the Rent Deposit on or before December 5, 2016. The Security Deposit is to be held as collateral security for the payment of any amounts payable by Tenant under this Lease, and for the faithful performance of all other covenants, agreements and obligations of Tenant hereunder. The Rent Deposit is to be applied to the first installment of Rent due. In no event shall Landlord be obligated to pay interest on the Deposits. Landlord and Tenant expressly agree that the Deposits shall be deemed to be the property of Landlord and may be commingled with Landlord's other funds. If there is an Event of Default by Tenant under the provisions of this Lease, Landlord may, at its option, apply any sums it has received pursuant to this Section 1201, against any amounts due from Tenant, and Tenant shall be obligated to deposit with Landlord, within five (5) days after Landlord's request, the amount necessary to restore the Security Deposit to the amount specified in Section 201. Landlord's application of any or all of the Security Deposit shall not be deemed to cure an Event of Default, shall not constitute an election of remedies, and shall be without prejudice to any other claim, right or remedy of Landlord. The Security Deposit shall be returned to Tenant within ninety (90) days after the later of (i) the Expiration Date or (ii) the date Tenant vacates and surrenders possession of the Premises if, and only if, there are no claims by Landlord against Tenant.

**1202.    2nd Security Deposit.** Tenant shall pay Landlord the 2nd Security Deposit before June 1, 2017. $10,000.00 of 2nd Security Deposit is refundable to Tenant upon Lease Option Renewal.

## ARTICLE 13
## COVENANTS OF TENANT

**1301.    Rules and Regulations.** The Tenant Parties shall at all times abide by and observe the rules and regulations set forth in **Exhibit B**, as the same may be modified or supplemented by Landlord from time to time, in writing with prior notice to Tenant (the "Rules and Regulations"). Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce such Rules and Regulations, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, contractors, invitees and customers. The failure of Landlord to enforce any of such Rules and Regulations against Tenant and/or any other tenant in the Shopping Center shall not be deemed a waiver of any such Rules and Regulations. If there is any inconsistency between this Lease and any current or future Rules and Regulations, this Lease shall govern.

**1302.    Status of Tenant.** By virtue of its execution of this Lease, any individual executing this Lease on behalf of Tenant represents and warrants that he/she holds the title noted below his/her signature and that he/she is authorized and empowered by all necessary legal means, including corporate, partnership, or company action (as applicable), and under applicable law, to execute and deliver this Lease on behalf of such entity and to bind such entity to its obligations hereunder. Tenant will remain qualified to do business and in good standing throughout the Term in the state in which the Premises is located. If the applicable entity is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of such entity hereby acknowledge and agree that they individually, jointly and severally, shall be responsible for all terms, covenants, and obligations of this Lease, in addition to said entity until such time as the applicable entity is properly qualified or duly existing.

9

## ARTICLE 14
### TENANT WORK

**1401. Tenant's Plans.** If Tenant chooses to make tenant improvement modifications, Tenant shall, at its sole cost and expense, provide Landlord, for Landlord's approval, four (4) copies of plans and specifications showing in reasonable detail any and all interior and/or exterior alterations or improvements that Tenant proposes to make to the Premises (collectively, the "Tenant's Plans"), within fourteen (14) calendar days after the Date of Lease (the "Tenant Plans Due Date"). Tenant's Plans shall be prepared such that Tenant's Work (as shown in Tenant's Plans), if completed in accordance with Tenant's Plans, shall be in accordance with all Laws. Tenant's Plans shall also be in accordance with all requirements of all applicable governmental authorities for submissions to obtain a building permit. Tenant shall reimburse Landlord for the reasonable costs and expenses of outside consultants incurred by Landlord in reviewing, approving and/or coordinating Tenant's Plans. Tenant shall not commence any work in the Premises prior to obtaining Landlord's written approval of Tenant's Plans. There shall be no changes to Tenant's Plans once Landlord approves the same, unless Landlord approves the changes in writing.

If Tenant shall fail to deliver Tenant's Plans to Landlord on or before the Tenant Plans Due Date or fails to respond to a submission of any plans by Landlord within one week after Landlord delivers same, such failure shall constitute an Event of Default under this Lease and, in addition to any remedies available at law or in equity or under this Lease, Tenant shall be obligated to pay a late charge pursuant to Section 2810 below, and the Fixturing Period set forth in Section 201 shall be reduced by one (1) day for each day after the Tenant Plans Due Date that Tenant fails to deliver Tenant's Plans to Landlord (which Tenant's Plans must be in the condition required in this Section 1401). Further, if Tenant has not delivered Tenant's Plans to Landlord within thirty (30) days after the Tenant Plans Due Date, then Landlord's Work as set forth in **Exhibit C** shall be null and void and Tenant shall be obligated to accept delivery of the Premises in "as is" condition.

**1402. Alterations.** Tenant shall not alter the exterior of the Premises and shall not make any structural or non-structural alterations to the interior of the Premises without first obtaining Landlord's written approval of such alterations. Tenant agrees that all improvements and fixtures, other than trade fixtures made or installed by it, shall immediately become the property of Landlord and shall remain upon the Premises, unless Landlord requires that Tenant at Tenant's cost, remove such alterations or improvements prior to the Expiration Date. Tenant shall, at its sole expense, promptly repair all damage caused by such removal. Tenant shall not be compensated for any alteration or improvements left in the Premises at the end of the Term. Except for installation of fixtures and other work to be performed by it in strict accordance with Tenant's Plans as approved by Landlord, Tenant shall not cut or drill into or secure any fixture, apparatus or equipment of any kind to any part of the Premises without first obtaining Landlord's written consent. If any alterations which Tenant causes to be constructed result in Landlord being required to make any alterations and/or improvements to other portions of the Shopping Center in order to comply with Laws, the Tenant shall reimburse Landlord upon demand for all reasonable costs and expenses incurred by Landlord in making such alterations or improvements.

**1403. Mechanic's Liens.** Nothing contained in this Lease shall be construed as consent on the part of Landlord to subject Landlord's estate in the Premises or the Shopping Center to any lien or liability under any Law relating to liens. Tenant shall not suffer, permit or give cause for the filing of a lien against the Premises or the Shopping Center. If any mechanic's or materialman's lien or notice of lien shall at any time be filed against the Premises or the Shopping Center by reason of work, labor, services or materials performed or furnished to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall immediately cause the same to be bonded or discharged of record. If Tenant shall fail to cause such lien or notice of lien to be discharged or bonded within five (5) days after the filing thereof, then, in addition to any other rights and remedies available to Landlord at law, or in equity or under this Lease, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amounts so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in paying, bonding off or procuring the discharge of such lien or notice of lien, shall be due and payable by Tenant to Landlord as Additional Rent within five (5) days of Landlord's demand therefor.

**1404. Construction.** All construction in the Premises shall be performed at Tenant's sole cost and expense in strict accordance with Tenant's Plans (or such other plans) as approved by Landlord. All construction or alterations performed in the Premises by Tenant shall comply with the following: (i) such alterations shall be performed in a good and workmanlike manner and in compliance with all applicable Laws and with all other provisions of this Lease, (ii) the value of Tenant's improvements after such alterations shall not be less than the value thereof prior to such alterations; (iii) such alterations shall not increase the parking requirement for the Premises or require any waivers for parking from applicable governmental authorities; (iv) such alterations shall not prevent the continued use of the Premises as a single integrated unit; (v) such alterations shall not affect the structural integrity of the Premises; (vi) no alterations shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required from time to time, all governmental approvals and permits; (vii) such alterations shall be pursued diligently and in good faith to completion; and (viii) such alterations shall be performed in a manner as to not to interfere with the business or operations of Landlord or any other occupant of the Shopping Center. Contractors must be licensed and carry at a minimum the insurance required in Article 9. Tenant shall use a contractor designated by Landlord for all work related to fire protection systems.

**1405. Modifications.** Should Tenant wish to make tenant improvement modifications, within thirty (30) days after completion of construction of Tenant's Work or any Tenant alterations, Tenant shall promptly deliver to Landlord Tenant's Plan showing any field modifications thereto.

**1406. Labor Relations.** Tenant shall conduct its labor relations and its relations with its employees and agents in such a manner as to avoid all strikes, picketing and boycotts of, on, or about the Premises and the Shopping Center. If, during the period of initial construction of the Premises, or during any subsequent alterations, any of Tenant's employees, or agents strike, or if picket lines or boycotts or other visible activities objectionable to Landlord are established or conducted or carried out against Tenant or its employees or agents on or about the Premises or the Shopping Center, Tenant shall immediately close the Premises to the public and remove all employees therefrom until the dispute giving rise to such strike, picket line, boycott, or objectionable activity has been settled to Landlord's reasonable satisfaction.

Tenant shall require that all contractors and subcontractors at any tier performing any construction, repair, refurbishment or restoration, including, without limitation, tenant improvements, build-out, alterations, additions, improvements, renovations, repairs, remodeling, painting and installations of fixtures, mechanical, electrical, plumbing, data, security, telecommunication, low voltage or elevator equipment or systems or other equipment, or with respect to any other construction work in, on, or to the Premises (including any such work performed by any person who contracts to provide services to any portion of the Premises, such as cable, DSL, communications, telecommunications or similar services) shall: (i) be bound by and signatory to a collective bargaining agreement with a labor organization (a) whose jurisdiction covers the type of work to be performed at the Premises, and (b) who is an "Approved Building Trades Department Contractor or Subcontractor;" and (ii) observe area standards for wages and other terms and conditions of employment, including fringe benefits. For purposes hereof, an "Approved Building Trades Department Contractor or Subcontractor" is a contractor or subcontractor who is currently affiliated with the Building and Construction Trades Department of the AFL-CIO (the "BCTD") or, if no such BCTD-affiliated contractor or subcontractor is available for a particular trade (e.g., carpentry work), a contractor or subcontractor which is affiliated with a national trade union which was formerly affiliated with the BCTD and which recognizes (and will recognize and respect, for its work at the Premises), the jurisdictional limitations established by the local BCTD.

## ARTICLE 15
### REPAIRS

**1501. Tenant Damage.** Subject to Section 908, Tenant shall repair promptly at its sole expense, or at Landlord's discretion reimburse Landlord for repairs resulting from, any damage to the Premises or any other improvement within the Shopping Center caused by the Tenant

10

Parties. Tenant shall be directly responsible to other tenants or occupants of the Shopping Center for any claim of such tenant or occupant, caused by the use of the Premises by the Tenant Parties.

**1502.    Tenant Repairs.** Tenant shall be solely responsible for keeping the Premises in good condition and repair (including replacement) from the Lease Commencement Date until the Expiration Date (or such later date as Tenant actually vacates the Premises), including, but not limited to, all required and necessary repairs to and replacements of the doors, door openers, door fixtures, windows, window frames and moldings, glass, floor, interior walls (including, but not limited to, party walls), wall coverings, ceiling, mechanical systems and equipment, electrical systems and equipment, plumbing and sewage equipment, systems, facilities and lines within the Premises, including free flow to the main sewer line, and heating, ventilating and air-conditioning systems and equipment ("HVAC"), fixtures, utility meters, fire extinguishers, and any systems and equipment exclusively serving the Premises (whether or not located within the Premises). Tenant shall not cause the roof of the Premises to be penetrated without first obtaining Landlord's written consent and, upon obtaining such consent, Tenant agrees that any such work shall be performed by Landlord's roofing contractor at Tenant's sole expense. Tenant agrees that any and all repairs to the sprinkler system shall be performed by Landlord at the sole cost of Tenant.

**1503.    Continuing Maintenance Obligations.** Tenant, at Tenant's sole expense, shall initiate and carry out a program of regular maintenance and repair of the Premises and shall keep and maintain the Premises in a clean, safe, and sanitary condition in accordance with all Laws and of the requirements of any insurance underwriters, inspection bureaus or a similar agency designated by Landlord, including, without limitation, (i) the painting or refinishing of all areas of the interior and maintaining or replacing of all trade fixtures and equipment, ceiling tile, flooring and other items of display used in the conduct of Tenant's business, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive condition throughout the Term and (ii) obtaining and maintaining, at Tenant's sole costs, service contracts with reputable, licensed mechanical contractors to carry out a program of regular maintenance and repair of the HVAC and, if Tenant is required to have a grease trap, the grease trap. From time to time, within five (5) days of Landlord's request, Tenant shall provide copies of such contracts to Landlord. All Tenant contractors performing alterations, replacements, or repairs that are required or permitted by this Lease shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld.

If Landlord elects, Landlord may perform routine inspections and make repairs to systems and equipment serving the Premises, such as HVAC, fire protection and sprinkler systems equipment. Tenant's allocated share of the foregoing costs may, at Landlord's discretion, be (i) included as part of Common Area Maintenance Costs, or (ii) billed to Tenant as Additional Rent, payable within fifteen (15) days after Tenant's receipt of such bill. Tenant's "allocated share" for purposes of this Section 1503 shall be such charges multiplied by a fraction, the numerator of which shall be the gross leasable area of the Premises, and the denominator of which shall be the total gross leasable area of the premises in the Shopping Center which such systems or equipment serves and which were inspected, serviced or repaired, as applicable (including the Premises).

**1504.    Failure to Make Repairs.** If any repairs and/or replacements required to be made by Tenant hereunder are not made within ten (10) days after written notice thereof by Landlord to Tenant, such failure shall constitute an Event of Default under this Lease, and Landlord may, at its option, make any or all such repairs and/or replacements without prior notice or liability to Tenant for any loss or damage which may result to Tenant's business by reason of such repairs and/or replacements (including, without limitation, damage to Tenant's business). As set forth in Sections 1901(a) and 2604, Landlord may make repairs and/or replacements without notice to Tenant if necessary in the event of an emergency. If Landlord makes any of the foregoing repairs, Tenant shall pay Landlord, within five (5) days of demand therefor, the cost of such repairs plus an administrative repair fee equal to fifteen percent (15%) of the cost of such repairs and/or replacements.

<center>

**ARTICLE 16**
**SURRENDER OF PREMISES; HOLDING OVER**

</center>

**1901.    Surrender.** Tenant, on the Expiration Date, shall peaceably surrender to Landlord the Premises in broom-clean condition and in good repair, and shall return to Landlord any and all keys (including, without limitation, access cards) furnished to, or otherwise procured by, Tenant relating in any way to the Premises or the Shopping Center; provided, however, in no event shall the Premises be deemed surrendered until Tenant has provided Landlord with a certification from a reputable HVAC contractor that the HVAC is in good repair and condition. Tenant hereby waives any and all notices to vacate. Subject to Section 1602, Tenant shall remove all of its personal property and removable trade fixtures and equipment, as well as its signs and identification marks (collectively "Personal Property") from the Premises at or before the end of the Term. Tenant agrees to repair all damage caused by such removal. In the event Tenant does not make any repairs as required by this Article 16, Tenant shall be liable for and agrees to pay Landlord's costs and expenses in making such repairs. No act or thing done by the Landlord Parties during the Term shall be deemed an acceptance of a surrender of the Premises and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. No employee of Landlord or Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease, and the delivery of keys to any such agent or employee shall not operate as a termination of this Lease or a surrender of the Premises.

**1602.    Trade Fixtures.** All trade fixtures owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removed by Tenant at the expiration of the Term, or the earlier termination of this Lease, provided Tenant shall not at such time be in default under any covenant, agreement or obligation contained herein; and, if in default, Landlord shall have a lien on such trade fixtures as security against loss or damage resulting from any such default by Tenant, and said trade fixtures shall not be removed by Tenant until such default is cured or Landlord notifies Tenant to remove such trade fixtures (or any items thereof) from the Premises.

**1603.    Failure to Remove Personal Property.** If Tenant fails to remove all of its Personal Property by the Expiration Date, then such Personal Property shall be deemed abandoned by Tenant and, at the option of Landlord, shall become the property of Landlord, or may be removed by Landlord at Tenant's expense, or may be placed in storage at Tenant's expense, or may be sold or otherwise disposed of, in which event, subject to the last sentence of this Section 1603, the proceeds of such sale or other disposition shall belong to Landlord. Tenant's obligations and covenants under this Article 16 shall survive the expiration or termination of this Lease. Landlord may sell Tenant's Personal Property at private sale and without legal process, for such price as Landlord may obtain, and apply the proceeds of such sale against any amounts due under this Lease from Tenant to Landlord and against any and all expenses incident to the removal, repair of any damage to the Premises resulting or caused by such removal, storage and sale of such Personal Property.

**1604.    Holding Over.** In the event that Tenant or anyone claiming under Tenant remains in possession of the Premises after the expiration of the Term of this Lease, and without the execution of a new lease, Tenant shall be deemed to be occupying the Premises as a Tenant from month-to-month, subject to all of the terms, conditions, provisions, and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy, except for Minimum Rent. The monthly installment of Minimum Rent for each month of any such month-to-month tenancy shall be an amount equal to one hundred and fifty percent (150%) of the monthly installment of Minimum Rent payable for the month immediately preceding expiration of the Term. Either Landlord or Tenant may terminate such month-to-month tenancy upon at least thirty (30) days' notice to the other party. This in no way, however, shall be construed as permitting Tenant to holdover. If Tenant holds over during any Term of the Lease, the obligations of the guarantor of Tenant's obligations hereunder shall extend to such hold over period and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any modification thereof.

<center>11</center>

## ARTICLE 17
### UTILITIES AND TRASH

1701.    **Utilities.** Tenant shall, at its sole cost and expense, pay promptly when due all fees, deposits and charges for water, gas, electricity, heat, sewer rentals or service charges, including use and/or connection fees, impact fees, tap fees, hook-up fees and/or standby fees, any other utility and telecommunication charges incurred by Tenant in its use and/or occupancy of the Premises or furnished to the Premises commencing upon the Lease Commencement Date. If Landlord is required or elects to supply water, gas, electricity, heat or sewer rentals, or any other utility service, for the Shopping Center and/or the Premises, then Tenant shall purchase the same from Landlord at the then-prevailing local rates and charges, and pay the charges therefor within ten (10) days after bills are provided to Tenant. Tenant shall use reasonable diligence in conservation of utilities.

1702.    **Utility Service Providers.** (a) If permitted by Law, Landlord shall have the right, in its sole discretion, at any time and from time to time during the Term, to either contract for service from different utility companies ("Alternate Service Providers") than those providing utility service on the date hereof ("Utility Service Providers") or continue to contract for service from the Utility Service Providers.

(b) Tenant shall cooperate with Landlord, the Utility Service Providers, and any Alternate Service Providers at all times and, as reasonably necessary, shall allow Landlord, Utility Service Providers, and any Alternate Service Providers reasonable access to all utility lines, feeders, risers, wiring, and any other machinery and/or equipment within the Premises. To the extent Landlord has the ability to control the same, any work to be done by Landlord, Utility Service Providers, and/or Alternate Service Providers, will be done in a manner to minimize, to the extent practicable, interference with Tenant's use and occupancy of the Premises, provided that Landlord shall not be required to incur additional expense thereby.

(c) Landlord shall in no way be liable or responsible for any loss, damage, or expense that Tenant may sustain or incur by reason of any change, failure, interference, disruption, defect, unavailability or unsuitability in the supply or character of the utilities furnished to the Premises, or if the quantity or character of the utility supplied by any Utility Service Providers or any Alternate Service Providers is no longer available or suitable for Tenant's requirements, and no such change, failure, interference, disruption, defect, unavailability, or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease.

1703.    **Interruption.** Landlord shall not be liable in damages or otherwise for any utility interruption.

1704.    **Trash.** Tenant shall arrange for regular, prompt, and reliable trash removal for all trash generated at or associated with the Premises, at Tenant's sole expense, using containers and dumpsters approved by Landlord and at such times in such manner, and in such locations, as Landlord may reasonably direct. Tenant shall require that any contract entered into by Tenant for trash removal at the Premises be terminable by Tenant upon no more than thirty (30) days' notice.

If Landlord elects, Landlord may provide common dumpsters for the Shopping Center, or a portion of the Shopping Center, and/or arrange for trash pick-up for one or more tenants. The charges that may be incurred by, or contracted for by, Landlord for maintaining the common dumpsters and/or trash removal are referred to herein as "Trash Charges." If Landlord provides common dumpsters and/or common trash removal services, Tenant shall pay, its allocated share of such applicable Trash Charges either (i) as part of Common Area Maintenance Costs, or (ii) as Additional Rent either being billed for same by Landlord, at Landlord's discretion. Tenant's allocated share of the Common Area Maintenance Costs applicable to the Trash Charges specified above shall be such charges multiplied by a fraction, the numerator of which shall be the gross leasable area of the Premises, and the denominator of which shall be the total gross leasable area of all tenants in the Shopping Center who use the common dumpsters. If Landlord deems Tenant's generation of trash at the Premises to be excessive, Tenant shall pay Landlord, as Additional Rent, the cost for same which exceeds normal trash generation for a tenant of comparable size.

1705.    **Governmental Limitations.** If any Laws impose mandatory or voluntary controls or guidelines on Landlord or the Shopping Center or any part thereof, relating to the use or conservation of energy, water, light or electricity or the provision of any other utility service provided with respect to this Lease, or if Landlord is required or elects to make alterations to the Shopping Center in order to comply with such mandatory or voluntary controls or guidelines, Landlord may, in its sole discretion, comply with such mandatory or voluntary controls or guidelines, or make such alterations to the Shopping Center. Neither such compliance nor the making of such alterations shall in any event entitle Tenant to any damages, relieve Tenant of the obligation to pay any of the sums due hereunder, or constitute or be construed as a constructive or other eviction of Tenant.

## ARTICLE 18
### SIGNS

1801.    **Sign Standards.** Tenant shall, at its own expense prior to the expiration of the Fixturing Period, install and at all times thereafter maintain in good condition and repair an exterior sign, and under-canopy sign if required by Landlord, of such size, color, design, illumination and location, all as designated and approved by Landlord, which approval shall not be unreasonably withheld. The sign(s) must conform to all requirements of governmental and regulatory bodies, and be in compliance with all Laws and Option B of Landlord's Sign Criteria as set forth in **Exhibit D** hereto. Landlord, in its sole and reasonable discretion, may modify the sign criteria from time to time, in which event Tenant shall promptly, at its own expense, bring its sign(s) (including any Identification Sign described in Section 1805 below, if applicable) into conformity with Landlord's new sign criteria. Within fourteen (14) days after the Date of Lease, Tenant shall submit to Landlord one (1) copy of Tenant's sign plans and specifications, showing in complete detail the proposed construction and installation of Tenant's exterior sign and under-canopy sign (if such under-canopy sign is required by Landlord) (the "Sign Plans"). Tenant's Sign Plans shall include a rendering of the proposed sign superimposed on the building elevation drawings (using size and placement to scale as reasonably possible). If Tenant fails to deliver the Sign Plans to Landlord within the time period set forth above, such failure shall constitute an Event of Default under this Lease. Tenant's exterior sign(s) shall be kept illuminated from dusk until 10:00 p.m. every day or at such other times as prescribed by Landlord.

1802.    **Sign Limitations.** Tenant shall not display any sign, lettering or lights on or adjacent to the exterior walls of the Premises, including, without limitation, both interior and exterior surfaces of windows and all surfaces of the Premises, unless first approved by Landlord in writing. Except for normal size, professionally designed and manufactured credit card emblems and store hours, Tenant shall not attach any sign to the inside of any window of the Premises which may be visible through such window from the outside of the building in which the Premises are located without the prior written approval of Landlord. Tenant shall at no time utilize any hand-drawn signs, scotch plaid decal strips or flashing or neon signs or lights in or on the Premises, and the bulbs of all Tenant's permitted signs and lights shall be replaced as soon as they become defective or lose their intensity. No rights are granted to Tenant to use the outer walls or the roof of the Premises for any purpose without Landlord's prior written consent. Tenant shall be responsible, at its sole cost and expense, for the fabrication, installation, maintenance, repair (including replacement) and operation of all its signs. All signage installed by Tenant shall comply with all Laws.

1803.    **Failure to Install Sign.** If Tenant fails to install an exterior sign as depicted on the Tenant's Sign Plans approved by Landlord before December 31, 2016, such failure shall constitute an Event of Default under this Lease and, in addition to any other remedies available to Landlord at law, in equity or under this Lease, a late charge shall be assessed against and paid by Tenant pursuant to Section 2610 below. In addition, Landlord may have a sign installed on behalf of Tenant and Tenant shall pay Landlord the cost of the sign and installation within fifteen (15) days of invoice from Landlord.

12

**1804.   Sign Removal.** Prior to the Expiration Date, Tenant shall remove all signs in or on the Premises and shall repair any damage, including the filling of holes caused by the installation or removal of the signs.

**1805.   Identification Signs.** If Landlord provides or modifies from time to time Tenant identification signs; such as pylon, undercanopy or directory signs, Tenant shall reimburse Landlord for the cost of such additional or modified signage.

<div align="center">

**ARTICLE 19**
**RIGHTS OF LANDLORD**

</div>

**1901.   Reserved Rights.** Landlord reserves the following rights with respect to the Premises:

(a) For Landlord and any Mortgagee, and their representatives, to have free and unrestricted access to, and to enter upon, the Premises at all reasonable hours (or in the event of an emergency at any time) for the purposes of inspecting the Premises, or of making repairs, replacements or improvements in or to the Premises, the building, equipment, or all or any portion of the Shopping Center (including, without limitation, sanitary, electrical, HVAC or other systems), or of complying with Laws, or of exercising any right reserved to Landlord under this Lease (including the right during the progress of any repairs, replacements, improvements or other work permitted or required by this Lease to keep and store within the Premises all necessary materials, tools and equipment); and

(b) To show, at reasonable times, the Premises during ordinary business hours to any existing or prospective Mortgagee, tenant, purchaser, assignee of any loan secured by the Shopping Center, or any portion thereof, or assignee of any interest in Landlord, and/or to any person contemplating the leasing of the Premises or any part thereof. If during the last month of the Term or any renewal or extension thereof, Tenant shall have removed all or substantially all of Tenant's trade fixtures from the Premises, Landlord may immediately enter and alter, renovate, and redecorate the Premises, without elimination or abatement of Rent, and without incurring any liability to Tenant for any compensation or otherwise, and such acts shall have no effect upon this Lease and shall not be deemed to release Tenant from any of Tenant's obligations under this Lease, including the obligations to return certain property, to repair and restore the Premises and to pay the full Rent and other sums due hereunder.

(c) To display a "For Sale" sign at any time, and also, after notice from either party of intention to terminate (as permitted pursuant to the provisions of the Lease) this Lease, or at any time within six (6) months prior to the Expiration Date, a "For Rent" sign, or both "For Rent" and "For Sale" signs, and all of said signs shall be placed upon such part of the Premises as Landlord shall require, except on display windows or doors leading into the Premises. Prospective purchasers or tenants authorized by Landlord may inspect the Premises at reasonable hours;

(d) To install or place upon, or affix to, the roof and exterior walls of the Premises equipment, signs, displays, antenna, and any other object or structure of any kind, provided the same shall not materially and adversely impair the structural integrity of the building in which the Premises are located or materially and adversely interfere with Tenant's occupancy;

(e) At any time, and from time to time, to make alterations or additions to, and to build additional stories on, the building in which the Premises are contained, and to build in or on the areas adjoining the Premises, including, without limitation, the Common Area. Landlord also reserves the right to construct other buildings or improvements or add to existing buildings or facilities in the Shopping Center, to expand and/or subdivide the Shopping Center, and to permit others to do so, from time to time;

(f) To discontinue any and all facilities furnished and services rendered by Landlord not expressly covenanted for herein, it being understood that they constitute no part of the consideration for this Lease;

(g) At any time, and from time to time, to use all or any part of the roof and exterior walls of the Premises for any purpose; to erect scaffolds, protective barriers and other aids to construction on, around and about the exterior of the Premises, provided that access to the Premises shall not be completely denied; to enter the Premises to shore the foundations and/or walls thereof and/or to install, maintain, use, repair, inspect and replace pipes, ducts, conduits and wires leading through the Premises and serving other parts of the Shopping Center in locations which do not materially and adversely interfere with Tenant's use of the Premises. Tenant further agrees that Landlord may make any use it desires of the side or rear walls of the Premises, provided that there shall be no encroachment upon the interior of the Premises;

(h) If an excavation shall be made or authorized to be made upon land adjacent to the Premises, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent;

(i) Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other losses or annoyance arising from the exercise of any or all of the rights of Landlord under this Article 19;

(j) The purpose of the plan annexed hereto as Exhibit A is solely to show the approximate location of the Premises and shall not be deemed to be a warranty, representation or agreement of any kind on the part of the Landlord. Landlord hereby reserves the right at any time, and from time to time, to make changes or revisions in such plan, including, but not limited to, additions to, subtractions from, and/or relocations or rearrangements of, the buildings, parking areas, and other Common Area shown on such plan; provided only that the size of the Premises and reasonable access thereto shall not be substantially impaired;

(k) Landlord reserves the right at any time, and from time to time, to add to and incorporate additional land into the Shopping Center and the right to build additional buildings and Common Area on such additional land. Landlord reserves the right to sever the ownership of or title to the various sections of the Shopping Center and/or to place separate Mortgages on such sections and to grant easements to the occupants of any severed portion to use the Shopping Center, or to cause land or buildings which are currently part of the Shopping Center to be treated as if the same are not part of the Shopping Center. Tenant shall execute from time to time such instruments reasonably required by Landlord and its Mortgagee(s) to effectuate the provisions of this Section 1901 (k);

(l) If Tenant shall not be personally present to open and permit an entry into the Premises at any time when for any reason an entry therein shall be necessary or permissible, Landlord Parties may enter the same by a master key, or may forcibly enter the same, without rendering Landlord Parties liable therefor, and without any abatement of Rent or in any manner affecting the obligations and covenants of this Lease. Landlord shall exercise its rights of access to the Premises permitted under any of the provisions of this Lease in such manner as to minimize, to the extent practicable, interference with Tenant's use and occupancy of the Premises, provided that Landlord shall incur no additional expense thereby; and

(m) Landlord has the right, at Landlord's sole and absolute discretion, at any time during the Term, to remodel or change the roof and/or other exterior surfaces of the Shopping Center. Tenant understands that, during such remodeling, it might be necessary to remove Tenant's existing sign(s) and that such sign(s) may not be suitable for reinstallation after the remodeling is completed. Such sign(s), or part thereof, which Tenant has installed, shall remain the property of Tenant, but Landlord is released from any and all liability for damages to such sign(s) during its removal, provided said removal was conducted with reasonable care. During any such remodeling, Tenant shall cooperate

<div align="center">13</div>

with Landlord and execute any documentation required or desirable to facilitate the remodeling process. Tenant understands that it may be necessary to erect scaffolds or other construction equipment during the remodeling, but access to the Premises shall not be denied.

1902.   Relocation. Intentionally Deleted.

<div align="center">

## ARTICLE 20
### DAMAGE TO PREMISES

</div>

2001.   Landlord's Obligation to Restore. If the Premises shall be damaged by fire or other cause, this Lease shall not be terminated and Landlord shall proceed with diligence, subject to applicable Laws, and as soon as practicable after such damage occurs, to repair such damage (excluding Tenant's leasehold improvements, trade fixtures, furniture, equipment and Personal Property or other items Tenant is required to insure or for which it has insurance coverage, all of which shall be restored by Tenant) at the expense of Landlord, if Landlord is insured with respect thereto to the extent of insurance proceeds made available to Landlord by any Mortgagees, or at the expense of Tenant, if Tenant is required to be insured hereunder with respect to such damage (in either case taking into account the time necessary to effectuate a satisfactory settlement with any insurance company involved and for such other delays as may result from government restrictions, controls on construction, if any, and strikes, emergencies, and other conditions beyond the control of the parties); provided, however, that if (i) the Premises are damaged by fire or other cause to such extent that the damage, in Landlord's reasonable determination, cannot be fully repaired within ninety (90) days from the date of settlement of the insurance claims and Landlord's obtaining building permits or (ii) if the building of which the Premises are a part is damaged to the extent of more than fifty percent (50%) of the cost of replacement thereof and such damage cannot be repaired within one hundred eighty (180) days from the date of such occurrence, then Landlord may terminate this Lease by notice to Tenant within sixty (60) days after the date of the casualty. Landlord may only elect to terminate the Lease pursuant to (ii) in the immediately preceding sentence if Landlord also terminates all of the leases with similarly situated tenants in the building of which the Premises are a part provided Landlord has the right to terminate under the terms of such leases. Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate this Lease if (1) insurance proceeds are insufficient to pay the full cost of such repair and restoration, (2) the holder of any Mortgage fails or refuses to make such insurance proceeds available for such repair and restoration, or (3) zoning or other applicable Laws do not permit such repair and restoration.

2002.   Abatement. Subject to the provisions of the next succeeding sentence, during the period that Tenant is deprived of the use of the damaged portion of the Premises, Tenant shall be required to pay Rent adjusted in the manner described below to cover only that part of the Premises that Tenant is able to occupy, and the Rent for such space shall be that portion of the total Rent which the amount of the gross leasable area of the Premises remaining that can be occupied by Tenant bears to the total gross leasable area of the Premises. If such damage is caused in part by the fault or neglect of the Tenant Parties, and if Landlord, or any Mortgagee, shall be unable to collect the insurance proceeds applicable to such damage because of some action or inaction on the part of Tenant, or the employees, contractors, licensees or invitees of Tenant, such damage shall be repaired promptly, at Tenant's sole cost and expense, either by Landlord or, at Landlord's option, by Tenant, subject to Landlord's direction and supervision, and there shall be no abatement of Rent. Landlord shall not be liable for delays in making of any such repairs that are due to Force Majeure.

2003.   Notice. Tenant shall give Landlord prompt written notice of any accident, fire or damage occurring on or to the Premises or the Shopping Center.

<div align="center">

## ARTICLE 21
### CONDEMNATION

</div>

2101.   Taking. If all of the Premises (or all rights of use or occupancy of the Premises) shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose, or purchased by such authority under threat of such taking (collectively, a "Taking"), this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the Rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority. If less than all of the Premises is the subject of a Taking, the Rent shall be equitably adjusted on the date when title to the portion of the Premises taken vests in such governmental or quasi-governmental authority and the Lease shall otherwise continue in full force and effect. Tenant shall have no claim against Landlord (or otherwise) for any portion of the amount that may be awarded as damages as a result of any Taking, or for the value of any unexpired portion of the Term, or for loss of profits or moving expenses, or for any other claim or cause of action resulting from such Taking. Tenant shall have the right to make a separate claim against the condemning authority for moving expenses, loss of business, and any other awards to which it may be entitled separately from any award due to Landlord as long as such award to Tenant does not diminish Landlord's award.

<div align="center">

## ARTICLE 22
### BANKRUPTCY

</div>

2201.   Events of Bankruptcy. The following shall be "Events of Bankruptcy" under this Lease:

(a) Tenant's or Tenant's guarantor, if any, becoming insolvent, as that term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code"), or under the insolvency laws of any state, district, commonwealth, or territory of the United States (the "Insolvency Laws");

(b) the appointment of a receiver or custodian for all or a substantial portion of Tenant's or Tenant's guarantor, if any, property or assets, or the institution of a foreclosure action upon all or a substantial portion of Tenant's or Tenant's guarantor, if any, real or personal property;

(c) the filing by Tenant or Tenant's guarantor, if any, of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

(d) the filing of an involuntary petition against Tenant or Tenant's guarantor, if any, as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within thirty (30) days of filing, or results in the issuance of an order for relief against the debtor, whichever is later ;or

(e) Tenant's or Tenant's guarantor, if any, making or consenting to an assignment for the benefit of creditors or a common law composition of creditors.

2202.   Landlord's remedies upon the occurrence of an Event of Bankruptcy shall be as follows:

(a) Landlord shall have the right to terminate this Lease and/or any services being provided to Tenant under this Lease by giving notice to Tenant, whereupon Tenant shall be immediately obligated to quit the Premises. Any other notice to quit or notice of Landlord's intention to re-enter is hereby expressly waived. If Tenant elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however, to the right of Landlord to recover from Tenant all Rent and any other sums accrued up to the time of termination or recovery of possession of the Premises by Landlord, whichever is later, and any other monetary damages or loss of Rent sustained by Landlord; provided, however, and notwithstanding the foregoing or any remedies set

<div align="center">14</div>

forth in this Section 2202. Landlord shall not have the right to terminate this Lease while a case in which Tenant is the subject debtor under the Bankruptcy Code is pending, unless Tenant or Tenant's trustee in bankruptcy (the "Trustee") is unable to comply with the provisions of Sections 2202(e), (f) and (g) below.

(b) Upon termination of this Lease pursuant to Section 2202(a), Landlord may proceed to recover possession under and by virtue of the provisions of the Laws of the jurisdiction in which the Shopping Center is located, or by such other proceedings, including re-entry and possession, as may be applicable.

(c) Upon termination of this Lease pursuant to Section 2202(a), Landlord shall have the option to relet the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition. Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or if the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord hereunder.

(d) Any damage or loss of Rent sustained by Landlord as a result of an Event of Bankruptcy may be recovered by Landlord, at Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive relettings, or in a single proceeding deferred until the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant shall pay Landlord the difference, if any, between the present value of the Rent reserved under this Lease on the date of breach, discounted at eight percent (8%) per annum, and the fair market value of the Lease on the date of breach. If Tenant becomes the subject debtor in a case under the Bankruptcy Code, the provisions of this Section 2202(d) may be limited by the limitations of damage provisions of the Bankruptcy Code. In addition, Tenant shall reimburse Landlord for its reasonable attorneys' fees incurred in enforcing or interpreting the provisions of this Article 22, including, but not limited to, any and all costs incurred in consulting with its attorneys with respect to any suit or dispute under this Lease, whether or not suit is brought, and any and all costs of litigation with respect to such enforcement or interpretation (which, with regard to any suit or dispute whereby Landlord is seeking a monetary recovery, are hereby stipulated to be fifteen percent (15%) of the monies awarded to Landlord).

(e) If Tenant becomes the subject debtor in a case pending under the Bankruptcy Code, Landlord's right to terminate this Lease pursuant to this Article 22 shall be subject to the rights of Tenant or the Trustee to assume or assign this Lease. Tenant or the Trustee shall not have the right to assume or assign this Lease unless Tenant or the Trustee, within thirty (30) days of the Event of Bankruptcy (a) cures all defaults under this Lease, (b) compensates Landlord for monetary damages incurred as a result of such default, (c) provides "adequate assurance of future performance" (as defined in Section 2202 (f) below) and (d) complies with all provisions of Section 2202 of this Lease.

(f) Landlord and Tenant hereby agree in advance that the phrase "adequate assurance of future performance", as used in this Section 2202, includes adequate assurance (a) of the source of Rent and other consideration due under this Lease, and, in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the time Tenant became Tenant under this Lease; (b) that any assumption or assignment of this Lease is subject to all the provisions hereof, including, but not limited to, location, use and exclusivity, and will not breach any such provisions contained in any other lease or financing agreement; (c) that any assumption or assignment of this Lease will not disrupt or adversely affect the tenant mix or balance in the Shopping Center; and (d) that any Percentage Rent due under this Lease will not decline substantially.

(g) If Tenant or the Trustee, as applicable, is unable (a) to cure Tenant's defaults, (b) to reimburse Landlord for its monetary damages, (c) to pay when due the Rent due under this Lease, or any other payments required of Tenant under this Lease or (d) to meet the criteria and obligations imposed by Section 2202(f) above, then Tenant agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Section 2202(a) above.

## ARTICLE 23
## ASSIGNMENT AND SUBLET

**2301.    Consent.** Without the prior written consent of Landlord in each instance, which consent may be given or withheld in Landlord's sole and reasonable discretion, Tenant shall not assign, Mortgage, pledge, encumber, sublet, underlet, license or permit the Premises or any part thereof to be used by others, or otherwise transfer, voluntarily, by operation of law, or otherwise, this Lease or the Premises or any interest herein or therein. Neither the Premises, nor any part thereof, will be used, occupied or managed, or permitted to be used, occupied or managed, by anyone other than Tenant, or used for any purpose other than as permitted under this Lease, or be advertised for subletting. A sale, transfer, assignment, conveyance, endorsement or other disposition of (a) a general partnership interest, if Tenant is partnership, (b) a managing member's interest, if Tenant is a limited liability company or (c) fifty percent (50%) or more of the capital stock of Tenant (if Tenant is a corporation) or of the interest in capital, profits, or losses of Tenant (if Tenant is a partnership, limited liability company or partnership)shall be deemed to be an assignment of this Lease within the meaning of this Section 2301, unless such sale or transfer is made by (i) a publicly owned corporation, (ii) involves the sale or issuance of securities registered under the Securities Act of 1933, as amended, (iii) is made entirely amongst the existing stockholders or interest holders of Tenant, or (iv) results from the death of a stockholder or interest holder of Tenant. The transactions described in this Article are sometimes referred to in Article 23 as a "Transfer", and the person to whom Tenant's interest is transferred shall be referred to as a "Transferee."

**2302.    Intentionally Deleted.**

**2303.    Entities.** If Tenant is a partnership, (i) each present and future general partner or venturer shall be personally bound by all of the covenants, agreements, terms, provisions and conditions set forth in this Lease and (ii) in confirmation of the foregoing, at the time that Tenant admits any new general partner to its partnership or venturer to its joint venture, Landlord may require, and Tenant shall deliver, an agreement executed by each new partner in form and substance satisfactory to Landlord whereby such new general partner or venturer shall agree to be personally bound by all of the covenants, agreements, terms, provisions and conditions of this Lease, without regard to the time when such new partner is admitted to the partnership or when any obligations under any such covenants, agreements, terms, provisions and conditions accrue.

**2304.    No Subdivision; Notice.** Tenant shall have no right to ever subdivide or sublet a portion of the Premises. If Tenant desires to sublet the entire Premises, or assign this Lease, Tenant shall give written notice to Landlord at least one hundred twenty (120) days but not more than one hundred eighty (180) days prior to the proposed commencement date of the subletting or assignment. The notice shall set forth or be submitted with the following: (i) the name of the proposed Transferee, (ii) the balance sheets and profit and loss statements for the proposed Transferee or any other person to be liable for Tenant's obligations under this Lease covering the prior three (3) years (or for such shorter period as the proposed Transferee or other person may have been in existence), all certified as true and correct by the proposed Transferee, or an authorized officer thereof or such other person as may be liable for Tenant's obligation under this Lease, (iii) a full description of the

15

terms and conditions of the proposed Transfer, including copies of any and all documents and instruments, any purchase and sale agreements, sublease agreements, assignment agreements and all other writings concerning the proposed Transfer, (iv) a description of the proposed use of the Premises by the proposed Transferee, including any required or desired alterations or improvements to the Premises that may be undertaken by such Transferee in order to facilitate its proposed use, (v) a business plan for the proposed Transferee's operations at the Premises, including a statement of projected income, expense, and cash flow for such operation for the two (2) years following the proposed effective date of the Transfer, (vi) a list of personal, business and credit references of the proposed Transferee, (vii) the same information set forth in (i) through (iv) and (vi) of this Section 2304 but pertaining to any guarantor or other person who will be liable in any manner for the payment of any amounts under the Lease, and (viii) any other information, documentation or evidence that may be reasonably requested by Landlord.

**2305.    Recapture. Intentionally Deleted.**

**2306.    No Waiver.** Consent by Landlord to any assignment, subletting or other Transfer shall not include or be construed as consent to any Transfer by Tenant or its Transferee. Any Transfer by Tenant which does not comply with the provisions of this Article 23 shall be void.

**2307.    Profit.** Notwithstanding Landlord's consent, if Tenant sells, sublets, assigns, or otherwise Transfers this Lease and at any time receives periodic rent or other consideration which exceeds that which Tenant would at that time be obligated to pay Landlord under this Lease, Tenant shall pay to Landlord seventy-five percent (75%) of the gross increase in rent as the rent is received by Tenant and seventy-five percent (75%) of any other consideration received by Tenant from the Transferee.

**2308.    Assumption.** Should Landlord consent to a Transfer, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant, its proposed Transferee and Landlord shall execute an agreement prepared, by or acceptable to Landlord in its sole reasonable discretion, under which the proposed Transferee shall be bound by the terms and conditions of this Lease. Any consent by Landlord to a Transfer shall not in any manner be construed to relieve Tenant, any guarantor or any of their Transferees from obtaining the consent in writing of Landlord to any further Transfer, nor shall the same release or discharge Tenant from any liability, past, present or future, under this Lease, and Tenant shall continue fully liable in all respects hereunder. Further, all of the provisions of this Article 23 shall apply to any proposed Transfer by any Transferee and their respective Transferees. Notwithstanding anything contained herein to the contrary, if Tenant is in default hereunder, Tenant shall not be permitted to make a Transfer.

**2309.    Intentionally Deleted.**

**2310.    Continuing Liability.** Notwithstanding any permitted Transfer, Tenant shall at all times remain directly and primarily liable for the payment of Rent and for compliance with all of its other obligations under this Lease. Upon the occurrence of an Event of Default under Article 26 of this Lease, if the Premises or any part of the Premises are then assigned or sublet, Landlord, in addition to any other remedies provided in this Lease or by law, may collect directly from the assignee or subtenant all rents due and becoming due to Tenant under the sublease and apply the rent against sums due Landlord from Tenant under the Lease. The collection of any Rent directly from an assignee or subtenant shall not be construed to constitute a novation or release of Tenant from further performance of Tenant's obligations nor shall such acceptance of Rent be construed as a waiver of any Tenant violation under Article 23. Any guaranty of Tenant's performance executed as consideration for this Lease shall remain in full force and effect before and after any Transfer. Landlord may require Tenant, and Tenant agrees, to execute a guaranty of this Lease before Landlord consents to any Transfer. Landlord may proceed directly against Tenant without first exhausting any remedies for default which Landlord may have against any Transferee. In the event of a termination, re-entry or dispossess by Landlord following a sublease by Tenant, Landlord may, at Landlord's option, take over all of the right, title and interest of Tenant (as sublessor) under such sublease, and the subtenant shall, at Landlord's option, attorn to Landlord pursuant to the provisions of such sublease.

**2311.    Review Charges.** Tenant shall pay to Landlord $1,500.00 for attorneys' fees and administrative expense involved with the review, processing or preparation of any documentation in connection with a Transfer, whether or not Landlord's consent to such Transfer is required or obtained. Such fee shall be paid at the same time that Tenant submits its request for such assignment or sublet.

**2312.    Bankruptcy.** Anything contained in this Lease to the contrary notwithstanding, and without prejudice to Landlord's right to require a written assumption from each Transferee, any person or entity to whom this Lease is transferred including, without limitation, assignees pursuant to the provisions of the Bankruptcy Code, shall automatically be deemed to have assumed all obligations of Tenant arising under this Lease. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord and shall remain the exclusive property of Landlord and not constitute the property of Tenant or Tenant's estate within the meaning of the Bankruptcy Code. All such money or other consideration not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

<div align="center">

**ARTICLE 24**
**SUBORDINATION; ESTOPPEL**

</div>

**2401.    Subordination.** This Lease, automatically and without further act or deed by Tenant, shall be subordinate to any and all Mortgages currently existing or that may hereafter be placed upon the Shopping Center, or any portion thereof, and to any and all renewals, amendments, modifications, participations, consolidations, replacements and extensions thereof. Upon the request of Landlord or any Mortgagee or prospective Mortgagee, Tenant shall confirm such subordination by executing and delivering within ten (10) days of such request whatever documents Landlord or any present or prospective Mortgagee may require. Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such confirmation if Tenant shall fail to do so within such 10-day period. Said subordination and the provisions of this Section shall be self-operative and no further instrument of subordination shall be required by the holder of any Mortgage. The holder of any Mortgage to which this Lease is subordinate shall have the right (subject to any required approval of the holders of any superior Mortgage) at any time to declare this Lease to be superior to the lien, provisions, operation and effect of such Mortgage and Tenant shall execute, acknowledge and deliver all documents required by such holder in confirmation thereof. This Lease is subject to all documents of record.

**2402.    Estoppel.** Tenant shall, at any time and from time to time within five (5) days following written notice from Landlord, execute, acknowledge and deliver to Landlord and any person designated by Landlord in such notice, a statement in writing: (i) certifying, as true and complete, a copy of and identifying all the documents constituting this Lease and the dates thereof, (ii) certifying that this Lease is unmodified and in full force and effect (or if modified, that the same is in full force and effect as modified and stating the date and identifying such modifications), (iii) stating the last dates to which the Minimum Rent, Percentage Rent and Additional Rent have been paid, the amount(s) thereof and the extent such Rent has been paid in advance, (iv) stating whether Landlord has completed all work or installations required under the Lease, (v) stating whether or not Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default, or any Event of Default, and (vi) stating or certifying as to such other matters with respect to this Lease, the Premises or the respective parties' obligations hereunder as may be requested by Landlord or by any present or prospective Mortgagee or purchaser of the Premises or Shopping Center. Any such statement delivered pursuant hereto may be relied upon by any owner of the Shopping Center, or any portion thereof, any prospective purchaser of the Shopping Center, or any portion thereof, any Mortgagee, or any prospective assignee of any of the foregoing. The failure of Tenant to deliver any estoppel certificate in the time and in the manner required by this Section 2402 shall be deemed to be Tenant's express acknowledgment that the information set forth in any estoppel certificate

<div align="center">16</div>

Tenant shall forward to Landlord the most recent federal and state tax returns of Tenant and all guarantors of Tenant's use of lease. Any other documents and Financial Statements required by this Section 2407 shall be accurate by an independent certified public accountant. Tenant represents and warrants that all of the Financial Statements and Gross Sales statements submitted to Landlord in accordance with this Section 2407 and Article 7 shall be true and accurate and certified by a certified public accountant. Any misrepresentation or inaccuracy of the Financial Statements and Gross Sales statements shall be deemed to be a material Event of Default under this Lease. If the financial credit rating of Tenant, and/or, if applicable, Tenant's guarantor or surety is not acceptable for the purposes of any existing or contemplated financing, Landlord shall have the right to terminate this Lease if Tenant refuses to execute or supply such additional assurances and/or guarantors and/or sureties as Landlord shall state as necessary for such acceptance when due. If any such right to terminate is exercised pursuant to Section 2406 or 2407, each of the parties shall be released from any other further liability accruing after such date, any of the Deposits made hereunder shall (subject to the other provisions of this Lease) be refunded to Tenant without interest, and neither party shall have any liability to the other by reason of such termination.

**2408.   Notice to Mortgagee.** Tenant shall give any Mortgagee a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such Mortgagees. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the Mortgagee(s) shall have an additional thirty (30) days within which to cure such default, or, if such default cannot be cured within that time, such additional time as may be necessary if, within such thirty (30) days, any such Mortgagee(s) has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated so long as such remedies are being diligently pursued.

<div align="center">

**ARTICLE 25**
**RECORDATION**

</div>

**2501.   No Recordation.** It is agreed that Tenant shall not record this Lease and/or its Exhibits. Any violation of this clause shall be deemed an Event of Default on the part of Tenant, and Landlord, in addition to other remedies available for an Event of Default, shall be entitled to take all steps necessary to remove the Lease and/or its Exhibits from any records. Notwithstanding the above, a memorandum of lease may be recorded if necessary for Tenant to obtain financing for its business.

<div align="center">

**ARTICLE 26**
**DEFAULT**

</div>

**2601.   Events of Default.** The occurrence of any of the following shall constitute an event of default (each, an "Event of Default") under this Lease:

(a)   Failure of Tenant to pay any Rent when due;

(b)   Failure of Tenant to commence business by December 1, 2016;

(c)   Discontinuance of the operation of Tenant's business at the Premises;

(d)   Vacating and/or abandonment of the Premises;

(e)   An Event of Bankruptcy;

17

BC 11/7/2016
S:\BC Plaza, LLC\Bristow Commons\Bldg J\Twisted Cork\Lease 2016\Twisted Cork Lease FINAL.doc

delivered to Tenant for execution is true, correct and complete and agreed to by Tenant or, if no such certificate was delivered in advance for Tenant's approval, that the Lease is unmodified, in full force and effect, that no Event of Default in payment or performance exists and that any default which may exist is waived by Tenant. Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such statements if Tenant shall fail to do so within such five (5)-day period. Tenant waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and Tenant's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the building in which the Premises are contained, or the Shopping Center or Landlord's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

2403.   **Attornment.** If the Lease is not extinguished upon any such transfer or by transferee following such transfer, then at the request of such transferee, Tenant will attorn to and recognize any purchaser of the Shopping Center, or any portion thereof, at a foreclosure sale under any Mortgage, any transferee who acquires the Shopping Center, or any portion thereof, by deed in lieu of foreclosure, and the successor and assigns of such purchasers, as successor Landlord under this Lease for the unexpired balance of the Term of this Lease upon the same terms and conditions set forth in this Lease.

2404.   **Mortgagee Liability.** Tenant agrees that if any Mortgagee shall succeed to the interest of Landlord under this Lease, such Mortgagee shall not be:

    (a)    liable for any act or omission of Landlord;

    (b)    liable for the return of all or any part of the Security Deposit unless such Security Deposit has been turned over to the Mortgagee;

    (c)    subject to any offsets or defenses which Tenant might have against Landlord;

    (d)    bound by any Rent which Tenant might have paid more than one month in advance; or

    (e)    bound by any amendment or modification of this Lease made without such Mortgagee's prior written consent.

2405.   **Evidence.** Although the provision of Sections 2401, 2403 and 2404 are effective automatically and without further act or deed by Tenant, Tenant shall execute, acknowledge and deliver any and all documents deemed necessary to further evidence Tenant's agreement with these provisions.

2406.   **Mortgagee Approval.** If Landlord can obtain approval of this Lease by its existing or future Mortgagees only upon the basis of modifications of the terms and provisions of this Lease, Tenant shall agree to such modifications and shall execute any instruments amending this Lease containing such modifications provided that such modifications do not (i) increase Tenant's monetary obligations to Landlord hereunder or (ii) reduce the Term hereof or (iii) otherwise materially adversely affect any material and substantive right of Tenant expressly granted hereunder and if Tenant refuses to approve in writing any such modifications within thirty (30) days after Landlord's request therefor, Landlord shall have the right to terminate this Lease.

2407.   **Financial Statements.** Within ten (10) days of receipt of a request therefor from Landlord, Tenant shall forward to Landlord a financial statement for its most recent completed fiscal year of Tenant and/or, if applicable, Tenant's guarantor or surety, in form satisfactory to

(f)     Tenant's removal or attempt to remove, or manifestation of an intention to remove, Tenant's goods or property from or out of the Premises other than in the ordinary and usual course of business without having first paid and satisfied all obligations to Landlord for all Rent which may become due during the entire Term of this Lease;

(g)     Breach or failure of Tenant to strictly comply with any of the terms and provisions of Articles 9, 23, 24, 25 and 31 of this Lease; and

(h)     Tenant's failure to perform any covenant, condition or obligation under this Lease (other than those set forth in Sections 2601(a) through (g) above) within ten (10) days after written notice and demand by Landlord, unless the failure is of such a character as to require more than ten (10) days to cure, in which event it shall be an Event of Default upon (a) Tenant's failure to commence and proceed diligently to cure such default within such five (5) day period, and/or (b) Tenant's failure to cure such default within thirty (30) days after Landlord's notice to Tenant of such default; provided, however, no such notice shall be required hereunder if Tenant has received a similar notice within three hundred sixty-five (365) days prior to such default.

(i)     Any occurrence that is deemed an Event of Default elsewhere in this Lease.

(j)     If Tenant shall be given three (3) notices of default under this Section 2601 within any period of eighteen (18) months, notwithstanding any subsequent cure of the failure to perform or observe the terms or conditions of this Lease as identified in such notices.

(k)     The dissolution of Tenant.

2602.    Remedies. Upon the occurrence of an Event of Default:

(a)     Landlord may terminate this Lease and/or any services provided to Tenant under this Lease, by giving written notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate, and Tenant shall be obligated to immediately quit the Premises. Any other notice to quit or notice of Landlord's intention to re-enter the Premises is hereby expressly waived. If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease, without prejudice, however, to the right of Landlord to recover from Tenant all Rent accrued up to the time of termination or recovery of possession by Landlord, whichever is later, and any and all other monetary damages and/or loss of and/or deficiency in Rent sustained by Landlord.

(b)     Whether or not this Lease is terminated pursuant to Section 2602(a), Landlord may proceed to recover possession of the Premises under and by virtue of the provisions of the Laws of the state in which the Premises is located, or by such other proceedings, including re-entry and possession, as may be applicable.

(c)     Should this Lease be terminated pursuant to Section 2602(b), or if Landlord recovers possession of the Premises pursuant to Section 2602(b), or if Tenant shall abandon or vacate the Premises (whether or not the keys shall have been returned or the Rent shall have been paid) before the Expiration Date without having paid the full Rent for the remainder of the Term, Landlord shall have the option to relet the Premises (or any part thereof, alone or together with other premises) for such rent and upon such terms as Landlord (in Landlord's sole, subjective discretion) may deem advisable and, if the full Rent reserved under this Lease (and the costs, expenses, and damages indicated below) shall not be received by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, loss and/or deficiency in Rent, attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition. In putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs and/or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from any liability under this Lease. Upon any such re-letting, all rental received by Landlord from such re-letting shall be applied, first, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such re-letting and of any necessary alterations and repairs; third, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same become due and payable hereunder. In no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, if the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord.

(d)     If Tenant shall fail to pay any installment of Rent pursuant to the terms of this Lease, then Landlord may, by giving notice to Tenant, (a) declare the entire Rent reserved under this Lease (or any portion thereof stipulated in such notice) to be due and payable within three (3) days of such notice; or (b) require an additional security deposit to be paid to Landlord within three (3) days of such notice, in an amount not to exceed the Rent reserved during the next twelve (12)-month period.

(e)     Any damages and/or loss of and/or deficiency in Rent sustained by Landlord may be recovered by Landlord, at Landlord's option: (i) in one (1) or more separate actions, at any time and from time to time, as and to the extent that said damages and/or Rent shall have accrued, or (ii) in a single action deferred until on or after the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or (iii) in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the difference, if any, between (a) the present value of the Rent reserved under this Lease on the date of breach, and (b) the fair market value of the Lease from the date of the breach discounted at eight percent (8%) per annum, the latter remedy hereby acknowledged to be a fair estimation of Landlord's damages and not an unenforceable penalty.

(f)     Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term. In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction, the right to specific performance, and the right to invoke any remedy allowed at law or in equity or under this Lease.

(g)     If Tenant fails to conduct its business operations at the Premises during the Minimum Store Hours for more than seven (7) consecutive business days, it is agreed and understood that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right to collect as liquidated damages (and not as a penalty) three (3) times the Rent due for each month, or portion thereof, that such discontinuance shall persist.

2603.    No Waiver of Rights. If, under the provisions hereof, Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition, agreement or obligation contained in this Lease, nor of any of Landlord's rights under this Lease. No waiver by Landlord of any breach of any covenant, condition or agreement contained in this Lease and the Rules and Regulations promulgated hereunder shall operate as a waiver of such covenant, condition, agreement or rule or regulation itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord. No endorsement or statement on any check or letter accompanying a check for payment of Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent and/or to pursue any other remedy provided in this Lease.

18



**2604.   Landlord Self-Help.** If Tenant defaults in the making of any payment or in the doing of any act under this Lease required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act, and charge the amount of the expense thereof, if made or done by Landlord, with interest thereon at the Lease Interest Rate.  Such payment and interest shall constitute Additional Rent hereunder due and payable within five (5) days of Landlord's demand therefor, but the making of such payment or the taking of such action by Landlord shall not operate to cure such default or to estop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled at law, in equity or under this Lease.

**2605.   Interest.** Any sum accruing to Landlord under the provisions of this Lease which shall not be paid within ten (10) days of the due date shall bear interest from the date originally due at the Lease Interest Rate.

**2606.   Landlord's Lien.** Landlord shall have a lien upon all the personal property and fixtures of Tenant in the Premises, as and for security for the Rent and other obligations of Tenant herein provided.  In order to perfect and enforce said lien, Landlord may, at any time after default by Tenant in the payment of Rent or or other obligations to be performed or complied with by Tenant under this Lease, seize and take possession of any and all fixtures and personal property belonging to Tenant which may be found in and upon the Premises.  If Tenant fails to redeem the fixtures and personal property and fixtures so seized, by payment of whatever sum may be due Landlord under and by virtue of the provisions of this Lease, then, and in that event, Landlord shall have the right, after five (5) days' written notice to Tenant of its intention to do so, to sell such personal property so seized at public or private sale and upon such terms and conditions as to Landlord may appear advantageous, and after the payment of all proper charges incident to such sale, apply the proceeds thereof to the payment of any balance due to Landlord on account of Rent or other obligations of Tenant pursuant to this Lease.  If there shall then remain in the hands of Landlord any balance realized from the sale of said personal property and fixtures as aforesaid, the same shall be paid over to Tenant.  The exercise of the foregoing remedy by Landlord shall not relieve or discharge Tenant from any deficiency owed to Landlord which Landlord has the right to enforce pursuant to any other provision of this Lease.

**2607.   Waiver of Redemption.** Tenant hereby waives and surrenders all rights and privileges which it might have under or by reason of any present or future law to redeem the Premises, or to have a continuance of this Lease for the remainder of the Term after entry of a judgment for possession of the Premises, after being dispossessed or ejected therefrom by process of law or under the terms of this Lease, and/or after the termination of this Lease as herein provided.

**2608.   Cumulative Remedies.** The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any remedies or means of redress to which Landlord may at any time be lawfully entitled at law, in equity or under this Lease, and Landlord may invoke any remedy (including the remedy of specific performance) allowed at law, in equity or under this Lease as if specific remedies were not provided for herein.

**2609.   Application of Payments.** Landlord shall have the right to apply any payments made by Tenant to the satisfaction of any debt or obligation of Tenant to Landlord.

**2610.   Late Charges for Non-Monetary Defaults.** In addition to any other rights and remedies which Landlord may have at law, in equity or under this Lease, if (a) Tenant fails to deliver all insurance certificates required under Article 9 hereof within the number of days required in Article 9; (b) Tenant fails to deliver Tenant's Plans to Landlord pursuant to Section 1401 hereof; (c) Tenant fails to deliver the Sign Plans to Landlord or install an exterior sign pursuant to Article 18 hereof; or (d) Tenant fails to deliver the statements of Gross Sales to Landlord pursuant to Sections 705 and/or 708 hereof; Tenant shall pay to Landlord, upon demand, a late charge of One Hundred Fifty Dollars ($150.00) for each thirty (30) day period during which any such failure shall continue.

<div align="center">

**ARTICLE 27**
**LEGAL PROCEEDINGS AND NOTICES**

</div>

**2701.   Litigation Costs.** Should an Event of Default occur and/or should Landlord file suit against Tenant for any reason, including, but not limited to, a suit for possession of the Premises, payment of Rent, damages, or to enforce or interpret the provisions of this Lease, then Tenant shall reimburse Landlord for its reasonable attorneys' fees and all expenses and costs of litigation, including any appeals.  If suit is filed for past due Rent and/or money damages, Landlord shall be entitled to attorneys' fees in an amount not less than fifteen percent (15%) of the monies awarded to Landlord.

**2702.   Governing Law.** This Lease is made pursuant to, and shall be governed by and construed in accordance with, the Laws of the state in which the Premises is located and any applicable local or county Laws.  Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against the party who itself or through its agent prepared the same since both Landlord and Tenant have had the opportunity to fully negotiate this Lease and to procure and consult with legal counsel of their choosing.

**2703.   Severability.** If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.   In the event that any provision of this Lease would be deemed unenforceable due to the excessiveness or unreasonableness of any fee, charge, cost or expense for which payment is required thereby, then such provision automatically shall be deemed to be modified to provide that the amount of such fee, charge, cost or expense shall be the maximum permitted by law and such provision, as so modified, shall be enforced.

**2704.   Notices.** Any notice, demand or other communication required or permitted by law or any provision of this Lease to be given or served on either party shall be in writing, addressed to the party at the address set forth in Section 201, or such other address as the party may designate from time to time by notice, and (a) deposited in the United States mail, registered or certified, return receipt requested, postage prepaid, or (b) delivered by a private mail or courier service, delivery charges prepaid, which provides delivery confirmation (such as, without limitation, Federal Express, Airborne or UPS).  Any party shall have the right from time to time and at any time, upon at least ten (10) days' prior written notice delivered pursuant to the terms hereof, to change its respective address and to specify any other address within the United States of America, provided said new address is not a post office box or facsimile number.  All communications delivered, as set forth herein, shall be deemed received by the addressee on the delivery date, the delivery refusal date, or the undeliverable date, as shown on the return receipt or the delivery confirmation.  The "undeliverable date" shall mean the date the notice was first unsuccessfully attempted.  Notice from an attorney or agent acting or purporting to act on behalf of a party shall be deemed notice from such party if such attorney or agent is authorized to act on behalf of such party.

<div align="center">

**ARTICLE 28**
**SUCCESSORS AND ASSIGNS**

</div>

**2801.   Transfer of Landlord's Interest.** If in connection with or as a consequence of the sale, transfer or other disposition of the Shopping Center, or any portion thereof, Landlord ceases to be the owner of the Shopping Center or any portion thereof, Landlord shall be entirely freed and relieved from the performance and observance thereafter of all covenants and obligations under this Lease on the part of Landlord to be performed and observed, it being understood and agreed in such event (and it shall be deemed and construed as a covenant running with the land) that the person succeeding to Landlord's ownership of said Shopping Center shall, subject to the provisions contained in Sections 2401 and 2404 thereupon and thereafter assume, and perform and observe, any and all of such covenants and obligations of Landlord thereafter

<div align="center">19</div>



accruing while such party is the owner of the Shopping Center. Any Deposits or other security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to its successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

2802.    **Multiple Tenants.** If there shall be more than one party constituting Tenant, they shall all be bound jointly and severally by the terms, covenants, agreements and obligations under this Lease and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one party constituting Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. No rights, however, shall inure to the benefit of any assignee, sublessee or other transferee, of Tenant unless the Transfer to such transferee has been approved by Landlord in writing in accordance with this Lease but no approval of a sublease shall be deemed to create a privity or landlord and tenant relationship between Landlord and any subtenant

2803.    **Binding on Successors and Assigns.** This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, Tenant and their respective successors and assigns; provided, however, no rights shall inure to the benefit of any assignee or successor or successor of Tenant to the extent such assignee or successor acquired any purported interest herein in violation of Article 23. Subject to Sections 2401 and 2404, upon any sale or other transfer by Landlord of its interest in the Premises, and assumption of possession of the Premises by the transferee, such transferee shall be solely responsible for all obligations of Landlord under this Lease accruing thereafter and Landlord shall be fully and forever released of its obligations hereunder.

## ARTICLE 29
## BROKERS AND AGENTS

2801.    **Brokers.** N/A

2902.    **Intentionally deleted.**

## ARTICLE 30
## PERSONAL PROPERTY

3001.    **Lien on Personal Property.** This Lease shall constitute a security agreement under the Uniform Commercial Code of the jurisdiction in which the Shopping Center is located. None of the goods, wares, merchandise, inventory, furniture, fixtures, machinery, equipment or other personal property of Tenant situated on or in the Premises shall be removed from the Premises without the prior written consent of Landlord unless all Rent, and all other charges and sums then due to Landlord shall have been paid and discharged in full, and no Event of Default by Tenant has occurred. If required to be effective, upon the occurrence of an Event of Default by Tenant under this Lease, Landlord shall have the option, in addition to any other remedies provided at law, in equity or under this Lease to enter into the Premises with or without the permission of Tenant and take possession of any and all goods, wares, merchandise, inventory, furniture, fixtures, machinery, equipment and other personal property of Tenant situated on or in the Premises without liability for trespass or conversion and to enforce the first lien and security interest hereby granted in any manner provided by law. Upon Landlord's request, Tenant shall execute and deliver to Landlord one or more U.C.C. Financing Statements evidencing the foregoing lien in favor of Landlord in a form required by Landlord and the Laws. If Tenant shall fail to execute such U.C.C. Financing Statements within ten (10) days of Landlord's request, Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such U.C.C. Financing Statements.

## ARTICLE 31
## ENVIRONMENTAL COVENANTS AND PROHIBITED MATERIALS

3101.    **No Hazardous Substances and Moisture Infiltration.** Tenant shall maintain the Premises, and its operations thereon, in compliance with all federal, state and local laws, regulations, ordinances, rules, orders, and agency policies or guidelines regarding the environment, human health or safety ("Environmental Laws") that apply to the Premises or its use and will prevent any moisture from penetrating into any adjacent premises or other portion of the Shopping Center. Tenant shall not store or use hazardous substances or wastes, toxic substances or wastes, pollutants, or contaminants as those terms are defined by Environmental Laws, including but not limited to "hazardous substances" as defined under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (42 U.S.C. §§ 6601 et seq.); "hazardous wastes" as defined under the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §§ 6901 et seq.); "toxic substances" as defined under the Toxic Substances Control Act (TSCA) (15 U.S.C. §§ 6601 et seq.); "hazardous materials" as defined under Occupational Safety and Health Administration (OSHA) laws and regulations; oil, petroleum products, or their derivatives; and PCBs, asbestos, explosives, radioactive materials and any other toxic, flammable, reactive, ignitable, corrosive or otherwise hazardous substances (hereinafter "Hazardous Substances"). Tenant shall cure any spill, leak, discharge, or other release from, on, about, or under the Premises. Tenant shall take all measures to preclude any moisture from penetrating any adjacent premises or other portions of the Shopping Center and shall be responsible to Landlord and/or any adjacent tenant directly for any damage caused thereby. Tenant shall not install any underground or aboveground storage tanks on the Premises without Landlord's prior written permission, which may be withheld in Landlord's sole discretion. Tenant shall give Landlord written notice immediately upon Tenant's knowledge of any Hazardous Substances existing in the Shopping Center that impacts soil, groundwater, or surface water, or requires notification of regulators. At any time, and from time to time, prior to the expiration or earlier termination of the Term, Landlord shall have the right to (i) inspect any of Tenant's environmental records with respect to the Premises, and (ii) conduct appropriate tests and site investigations of the Premises to determine whether contamination has occurred as a result of Tenant's occupancy of the Premises. Tenant shall respond to any moisture (or mold) conditions that it discovers inside the Premises by notifying Landlord within 24 hours after Tenant identifies such conditions. If such conditions were caused by components of the Premises for which Tenant is responsible, then Tenant shall promptly remediate such conditions in accordance with Environmental Laws, including, without limitation, any OSHA laws, regulations, policies, or guidelines. See Section 901 (i) for Tenant's obligation to carry Environmental Legal Liability insurance.

3102.    **Failure to Cure.** Notwithstanding the expiration or earlier termination of this Lease, if upon the expiration or earlier termination of this Lease there exists a violation of Environmental Laws at the Premises for which Tenant is liable or if Tenant has failed to fulfil its obligations under this Article 31, and if such violation or failure delays another tenant from commencing its work or operations at the Premises, Tenant shall reimburse Landlord for Landlord's lost rental plus the amount required for Landlord to cure the violation of Environmental Laws and/or to cure Tenant's default by fulfilling Tenant's obligations under this Lease, if possible.

3103.    **Tenant Indemnification.** Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnitees harmless from any and all fines, suits, procedures, claims, liabilities, costs and actions of any kind, including counsel fees (including those incurred to enforce this indemnity or for any other purpose) arising out of or in any way related to (1) the Tenant's (or Tenant Related Parties') use, handling, generation, treatment, storage, disposal, and other management or Release of any Hazardous Substances from, on, about or under the Shopping Center or the Premises, whether or not the Tenant (or Tenant Related Parties) may have acted negligently with respect to such Hazardous Substances; or (2) the Tenant's (or Tenant Related Parties') failure to comply with the provisions of Article 31 of this Lease. Tenant's obligations and liabilities under this Lease survive the expiration or earlier termination of this Lease, and shall continue for so long as Landlord (including any successor or assignee) remains responsible or liable under Environmental Laws or otherwise for either any Releases of Hazardous Substances or for any violations of Environmental Laws that occurred during Tenant's possession of the Premises, unless caused by the Landlord Parties. Tenant's failure to abide by the terms of this Article 31 shall be enforceable by injunction.

20

## ARTICLE 32
## APPROVALS

**3201. Standards.** Except as otherwise expressly set forth in this Lease, any discretionary action or decision or approval or consent requested or required of Landlord under this Lease may be made, granted or denied by Landlord in its soleand reasonable discretion. Tenant hereby expressly acknowledges and agrees that Landlord shall not be held liable to Tenant, any person claiming under Tenant or any third party as a result of Landlord's approval or failure to approve or consent to any discretionary action or decision requested or required by Landlord under this Lease. If Landlord is found to be in breach of this Lease as a result of Landlord's failure to grant such approval or consent despite the foregoing provisions of this Section, Tenant's sole and exclusive remedy shall be to obtain injunctive relief directing Landlord to grant or deny such approval or consent.

**3202. No Plan Approval Liability.** Neither approval of the Tenant's Plans and Sign Plans by the Landlord Parties, nor any other inspections or approvals of the improvements on the Shopping Center or plans for construction thereof by Landlord Parties shall constitute a warranty or representation as to the technical sufficiency, adequacy or safety of the plans, structures, any of their component parts, or any other physical condition or feature pertaining to the improvements, it being acknowledged by Tenant that the Landlord Parties have made such approvals solely for determining and protecting the value of Landlord's property for internal purposes, and not as an expert in construction-related matters.

## ARTICLE 33
## LIABILITY OF LANDLORD

**3301. Limitation of Landlord Liability.** Notwithstanding anything to the contrary, Tenant shall neither assert nor seek to enforce any claim, and hereby waives any and all rights to assert or claim, for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Shopping Center, or any portion thereof, and Tenant shall look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that in no event shall Landlord or Landlord's Indemnitees (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be personally liable for any such liability. This Section shall not limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord. Notwithstanding anything to the contrary, in no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be liable for consequential, speculative, punitive damages, or lost profits.

## ARTICLE 34
## ENTIRE AGREEMENT AND MISCELLANEOUS

**3401. Entire Agreement.** This Lease is intended by the parties to be a final expression of their agreement and a complete and exclusive statement of the terms thereof. All of the agreements, conditions, covenants, terms, warranties, promises, understandings, obligations, limitations, representations, and provisions concerning the leasing of the Premises and/or the Tenant's occupancy in the Shopping Center are expressly contained in this Lease, and none shall be implied. Other than those expressly provided for in this Lease, Landlord or Landlord's Indemnitees have not made, and Tenant Parties have not relied upon, any representations, covenants, agreements, warranties, promises or statements ("Prior Information"); including, without limitation, with respect to estimated gross sales and common area maintenance calculations, any other financial matters, and any matters related to: (i) the Premises, (ii) any other premises in the Shopping Center, (iii) the building of the Shopping Center; (iv) the Shopping Center itself; (v) past, present or future tenancies, rents, expenses, operations, or (vi) any other matter. Except as expressly provided herein, this Lease may be amended, modified or terminated only by subsequent written agreement between the Landlord and Tenant. Tenant acknowledges that it does not have any exclusive rights in the Shopping Center with respect to the sale of its merchandise or the provision of its services.

**3402. Relationship of Parties.** Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between the parties hereto other than that of landlord and tenant.

**3403. Time is of the Essence.** Time shall be of the essence in the performance of all obligations under this Lease.

**3404. Exhibits.** The Exhibits attached hereto (or contemplated to be completed and attached to this Lease within the time periods specified in this Lease) are hereby made a part of this Lease as fully as if set forth in the text of this Lease. Unless expressly set forth to the contrary in this Lease, any site plans or tenant lists set forth in this Lease or in Exhibits to this Lease are not intended, in any way, to constitute a representation or warranty by, or on behalf of, Landlord or Landlord's Indemnitees (a) as to the past, current or future layout of the Shopping Center or the remainder of the Project or (b) as to the past, existing or future tenants or occupants in the Shopping Center or the remainder of the Project.

**3405. Compliance with Laws.** Tenant, at its sole expense, shall comply, and shall cause the Premises to comply, with all Laws that shall impose any duty upon Landlord or Tenant with respect to or arising out of Tenant's use or occupancy of the Premises. Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to nonperformance or noncompliance with or breach or failure to observe an item, covenant, or condition of this Lease upon Tenant's part to be kept, observed, performed or complied with. If Tenant receives notice of any violation of any Laws applicable to the Premises, it shall give prompt notice thereof to Landlord.

Notwithstanding the foregoing, Landlord shall, at its own cost and expense, comply with all Laws, rules, orders, ordinances and regulations now in force, or which may hereafter be in force, which affect the structural portions of the Premises; provided, however, Landlord shall not be required to comply with any such Laws for which it would otherwise be responsible, if the same have been imposed or are applicable as a result of the negligence of the Tenant Parties, Tenant's particular use of the Premises, Tenant's failure to make repairs required of Tenant hereunder, or which are imposed as a result of alterations or improvements made by Tenant, or as a result of Tenant's failure to comply with any of its obligations under this Lease and in such event Tenant shall comply with such Laws.

**3406. Rule Against Perpetuities.** Notwithstanding any provision in this Lease to the contrary, if the Term has not commenced within twenty-one (21) years after the Date of Lease, this Lease shall automatically terminate on the 21st anniversary of the Date of Lease. The sole purpose of this provision is to avoid any possible interpretation of this Lease as violating the Rule Against Perpetuities or other rule of law against restraints on alienation.

**3407. Gender and Number.** Masculine, feminine or neuter pronouns shall be substituted for one another, and the plural shall be substituted for the singular number, in any place or places herein in which the context may require such substitution.

**3408. Captions.** Any headings preceding the text of the several Articles, Sections and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

**3409. Counterparts.** This Lease may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same document. This Lease may also be executed in duplicate, each of which shall be deemed an original.

**3410.   Third Parties.** No term or provision of this Lease is intended to be, nor shall be, for the benefit of any Person not a party hereto, and no such other Person shall have any right or cause of action under this Lease.

**3411.   Lease Interpretation.** The obligations of Landlord and Tenant, respectively, under this Lease are expressly agreed by the parties to be independent covenants. The term "including", as used in this Lease, shall mean in each instance "including, without limitation" and the listed items following such term shall be construed to be exemplary and not exhaustive.

**3412.   Execution of Lease.** The submission of this Lease to each of Landlord and Tenant shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or an offer to Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until this Lease is fully executed and delivered by Tenant and Landlord. Specifically, neither party hereto shall have any obligation or liability to the other whatsoever at law or in equity (including any claims for detrimental reliance, partial performance, good faith or promissory estoppel or other similar types of claims) unless and until such time as both parties shall have executed and delivered the Lease. This Section supersedes all other conflicting verbal understandings or agreements or language set forth in this Lease.

**3413.   No Discrimination.** Tenant will not discriminate in the conduct and operation of its business in the Premises against any person or group of persons because of the race, creed, color, sex, age, national origin or ancestry of such person or group of persons.

**3414.   Counterclaims.** Tenant shall not impose any counterclaim or counterclaims in summary proceeding or other action brought by Landlord based on failure to pay Rent, holding over or breach of Lease, except to the extent that Tenant's failure to make such claim in such proceeding or action would, as a matter of law, preclude Tenant from raising such claim in any other proceeding or forum.

**3415.   Force Majeure.** If either party hereto shall be delayed or hindered in or prevented from the performance of any non-monetary act by Force Majeure, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section shall not operate to excuse Tenant from the prompt payment of Rent or any other payments required by the terms of this Lease and shall not operate to delay or extend this Lease Term. "Force Majeure" means a material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, industry-wide inability to procure materials, extraordinary restrictive governmental laws or regulations (such as gas rationing), mass riots, war, military power, terrorist acts, sabotage, material fire or other material casualty, Severe Weather, or an extraordinary and material act of God (such as a tornado or earthquake), but excludes inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Force Majeure. Delays or failures to perform resulting from lack of funds shall not be deemed delays beyond the reasonable control of a party. Strikes, walkouts or other labor troubles by the Tenant Parties shall not constitute an event of Tenant Force Majeure. "Severe Weather" means weather that a reasonable person would find unusual and unanticipated at the time of the scheduling of the activity based on recent weather patterns for the period in question in the vicinity of the Premises, provided that the delayed party delivers to the other party, upon request, reasonable documentation from an unbiased weather authority substantiating such claim.

**3416.   Anti-Terrorism and Money Laundering Representation and Indemnification.** Tenant certifies that: (i) neither it nor its officers, directors, or controlling owners is acting, directly or indirectly, for or on behalf of any "SDN" (as hereinbelow defined); (ii) neither it nor its officers, directors or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any SDN; and (iii) neither it nor its officers, directors or controlling owners is in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Tenant hereby agrees to defend indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys fees and costs) arising from or related to any breach of the foregoing certification. Should Tenant, during the Term, be designated an SDN, Landlord may, at its sole option, terminate this Lease. "SDN" means any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person", or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control.

### ARTICLE 35
### SPECIAL PROVISIONS

**3501. Waiver of Jury Trial.** TO INDUCE LANDLORD AND TENANT TO ENTER INTO THIS LEASE, LANDLORD AND TENANT EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL ISSUES CLAIMS, CAUSES OF ACTION AND/OR IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE, ANY OF THE PROVISIONS HEREOF, AND/OR TENANT'S USE AND/OR OCCUPANCY OF THE PREMISES. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND LANDLORD AND TENANT EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR TENANT NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR TENANT HAS MADE ANY REPRESENTATIONS OF FACT OR LAW TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LANDLORD AND TENANT EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE AND THIS WAIVER WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound have executed this Shopping Center Lease under their respective seals as of the day and year first above written.

WITNESS:

Name: __NARENDRA PRAKASH__

By: _____
Name: _____
Title: __Member__

LANDLORD:
BC PLAZA LLC

By: _____ (SEAL)
Name: __SAMEER PATEL__
~~Managing~~ Member

TENANT:
SKIPPER ENTERPRISES LLC, a Virginia LLC
ATTEST:

By: _____ (SEAL)
Name: Skipper _____ SKIPPER
Title: __OWNER__
Federal Tax ID #: __91-4340614__

11/9/16

BC 11/7/2016
S:\BC Plaza, LLC\Bristow Commons\Bldg 3\Twisted Cork\Lease 2016\Twisted Cork Lease FINAL.doc

By:_____

Name:_____

Title:_____

By:_____ (SEAL)

John Skipper:_____

Title:_____

Federal Tax ID #:_____

[Corporate Seal]

4/9/16

officers, directors or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any SDN; and (iii) neither it nor its officers, directors or controlling owners is in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Tenant hereby agrees to defend indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys fees and costs) arising from or related to any breach of the foregoing certification. Should Tenant, during the Term, be designated an SDN, Landlord may, at its sole option, terminate this Lease. "SDN" means any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person", or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control.

## ARTICLE 35
### SPECIAL PROVISIONS

3501. Waiver of Jury Trial. TO INDUCE LANDLORD AND TENANT TO ENTER INTO THIS LEASE, LANDLORD AND TENANT EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL ISSUES CLAIMS, CAUSES OF ACTION AND/OR IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE, ANY OF THE PROVISIONS HEREOF, AND/OR TENANT'S USE AND/OR OCCUPANCY OF THE PREMISES. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND LANDLORD AND TENANT EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR TENANT NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR TENANT HAS MADE ANY REPRESENTATIONS OF FACT OR LAW TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LANDLORD AND TENANT EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE AND THIS WAIVER WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound have executed this Shopping Center Lease under their respective seals as of the day and year first above written.

WITNESS:

Name: _Maushee_

BHUPENDRA PRAKASH

By: _____
Name: _Member_

BHUPENDRA PRAKASH

By: _____
Name: GEORGE SKINNER
Title: OWNER

[Corporate Seal]

LANDLORD:
BC PLAZA, LLC

By: _____ (SEAL)
Name: RAMESH PATEL
Managing Member

TENANT:
SKIPPER ENTERPRISES LLC, a Virginia LLC
ATTEST:

By: _____ (SEAL)
Nancy Skipper    NANCY SKIPPER
Title: Owner
Federal Tax ID #: 81-4240814

By: _____ (SEAL)
John Skipper    John, Jr., MGR
Title: OWNER
Federal Tax ID #: 81-4240814

11/9/16



RETAIL SPACES
## BRISTOW COMMONS
9100 Devlin Road, Bristow, VA 20136



Premises

EXHIBIT B
TO
LEASE

## Rules and Regulations

A.      Tenant shall be obligated to do the following:

(i)      Keep the Premises, including all exterior surfaces and both sides of all glass clean, orderly and sanitary;

(ii)     Keep the outside areas adjacent to the Premises clean, orderly and free of ice and snow, rubbish, obstructions and merchandise;

(iii)    Display the certificate of occupancy for the Premises in the Premises (if required by applicable law) and provide Landlord with a copy of the certificate of occupancy for the Premises;

(iv)     Keep the Premises free of garbage and trash and remove the same from the Premises to containers approved by Landlord;

(v)      Maintain the Premises free of insects, rodents, vermin and other pests;

(vi)     Keep all mechanical apparatus free of vibration and noise;

(vii)    Procure and maintain at its sole cost and expense any permits and licenses required in the transaction of Tenant's business;

(vii)    Conduct its business in all respects in a dignified manner in accordance with the high standards of first-class store operations;

(ix)     Load and unload goods at such times in the areas and through such entrances as may be designated by Landlord;

(x)      Maintain the temperature in the Premises to prevent freezing of plumbing lines and fixtures;

(xi)     If the Premises connects to a climate controlled interior mall, operate heating and cooling equipment to maintain store temperature between 68°F and 74°F in the winter and between 72°F and 78°F in the summer, or in accordance with the then prevailing government regulations respecting minimum and maximum winter and summer store temperatures;

(xii)    Keep its show windows dressed, using only professionally prepared signage which must be submitted to Landlord for approval prior to installation;

(xiii)   Keep its show windows and exterior signs illuminated from dusk to 10:00 p.m. every day;

(xiv)    Keep the Premises open during the hours prescribed in Section 201;

(xv)     Abide by all Rules and Regulations set forth in this Exhibit B as may be changed by Landlord from time to time;

B.      Tenant agrees not to do the following:

(i)      Display any sign visible outside the Premises without first having obtained Landlord's written permission;

(ii)     Use the Premises or any other part of the Shopping Center for any Prohibited Use;

(iii)    Cause the accumulation of garbage, trash, rubbish or refuse in the Premises or the Shopping Center;

(iv)     Display or store merchandise outside the Premises;

(v)      Distribute hand bills or other advertising matter or solicit business in the Common Area;

(vi)     Permit parking of any vehicle for more than 24 hours;

(vii)    Attach any awning, antenna, or other projection to the roof or the outside walls of the Premises or the building of which the Premises are a part;

(viii)   If the Premises are in an enclosed mall, be open for business on any day unless the mall is opened and operated by Landlord;

(ix)     Use or permit the use of objectionable advertising mediums such as loud speakers or other mediums that irritate or have the tendency to irritate other tenants within the Shopping Center or their customers or invitees.

11/9/16

Twisted Cork

EXHIBIT C
TO
LEASE

### Construction

I.      **Landlord's Work.** Except for the items specifically listed below, Tenant expressly acknowledges and agrees that it is obligated to accept the Premises in their current "as is" condition:

**Structure:**

1. Structural frame, at Landlord's option, either steel frame, reinforced concrete bearing wall construction, or a combination thereof.

2. Exterior walls, at Landlord's option, either masonry, EIFS, and/or other materials.

*Caution:* Additional structural loads, such as conduits, hangers, fixtures, walls, ceiling, and miscellaneous mechanical/ electrical equipment must be approved prior to installation by Landlord's structural engineer at Tenant's expense.

**Roof:**

Roof, at Landlord's option, insulated single membrane fully adhered and mechanically fastened to the roof deck. Tenants with open ceilings to the roof deck will have the visual appearance of the roof fasteners. *Note:* Additional roof penetrations required by Tenant shall be installed by Landlord's roof contractor at Tenant's expense.

**Floor:**

Floor will be a four inch (4") concrete floor slab. (Note: slab "hold-out" areas are provided at sanitary sewer locations). Tenant is responsible for completing concrete floor installation as part of Tenant's work.

**Walls:**

Exterior walls are unfinished on the inside. Tenant is responsible for furring, insulation, and wall finish material.

**Ceiling:**

No ceiling is to be provided.

**Storefront:**

Landlord shall provide and install a storefront per Landlord's architect's design with a glass entry door/doors as shown on Landlord's drawings, the color of which shall be selected by Landlord's architect as required. Storefront shall have one (1) manually operated door with construction cores.
**Demising and Exterior Wall:**

Landlord shall provide metal or wood stud wall framing from the floor to the roof deck or upper floors. Wall to be fire caulked as required.

**Electrical:**

Landlord shall provide electrical service consisting of at least 200 ampere to the premises in a designated electrical room or area, conduit and wire to a minimum 40 circuit electrical panel within Tenant's premises.

**Electrical Outlets:**

Landlord is not providing any electrical outlets or distribution.

**Gas Meter:**

Landlord shall provide gas up to the premises ready for Tenant to install meter.

**Heating, Ventilating & Air Conditioning ("HVAC"):**

Landlord shall provide curbs in the roof for HVAC installation by Tenant.

**Rear Door:**

Landlord shall provide a painted 3' x 7' hollow metal door with construction cores. Door to include battery operated alarmed panic hardware.

**Lighting:**

Landlord is not providing any permanent lighting but may leave some temporary lighting for Tenant's use. Tenant responsible for electric charges associated with temporary lighting use.

**Bathroom:**

Landlord is not installing any bathrooms or plumbing. A four inch (4") sanitary sewer service shall be installed within the Premises at a depth of three feet (3') below Finish Floor Elevation and a one inch (1") potable water supply pipe at the edge of the Premises. Landlord shall stub plumbing to the premises.

11/9/16

Twisted Cork

**Exterior Sign:**

Landlord shall not provide any Improvements to accommodate exterior signage.

**Fire Alarm:**

Landlord shall not provide fire alarm or appurtenant components.

II.     **Tenant's Work.** Except for those items specifically set forth above as Landlord's Work, Tenant, at Tenant's expense, shall furnish and install all Improvements, equipment, and fixtures to the Premises necessary for Tenant in order to prepare the Premises for the opening and continued operation of Tenant's business.

Tenant's construction shall comply with applicable Laws, including Fire, Health or Safety Codes.  Where conflict exists, local and state codes and ordinances shall govern.

All required permits for Tenant's Work shall be obtained and fees paid therefor by Tenant.  Tenant will obtain, at Tenant's expense, a Certificate of Occupancy prior to opening for business and Tenant will provide Landlord with a copy of the final Certificate of Occupancy.

Twisted Cork

EXHIBIT C-1
TO
LEASE

Leased Furniture, Fixtures & Equipment ("FF&E") List

All Kitchen Equipment
- Walk-in Refrigerator
- Hoshizaki Ice Maker
- Anatco Refrigeration Table
- Hobit Refrigeration
- Small TRUE Freezer
- Single door freezer (dented)
- Tilting skillet
- Southbend6 burner double oven/grill
- Double VULCAN oven
- Sprinklered Hood system
- Side-by-side reach-in
- Bread warmer
- Coffee maker and coffee grinder
- Storage Racks
- Bar refrigerators & freezer

Aesthetic Décor

- 2 x Giant hanging fork & spoon on wooden frames
- House painting
- Bird painting
- Hanging rack of wine bottles
- Mallet
- Spoon
- Hanging red peppers
- Red tree painting
- 3 x shelf with decoration items
- New York tribune
- Sketched drawing
- Model metal bicycle
- Bucket of wheat
- Wooden car
- Giant car
- Twig reef
- Pumpkin/barn wooden picture
- Clock
- Cow paining
- 2 bathroom mirrors
- Blue painting
- Tree painting
- Picture frame
- Tin containers

Audio and Visual Equipment
- Stereo System & Music Box setup
Indoor & Outdoor Speakers
- Two (2) Flat Screen Televisions
- Telephone system (two cordless phones/one desktop phone)
- 1 POS in office system with 3 server POS systems and 5 printers
- 3 laptops
- 1 HP printer

Security Equipment
- Internal/External Installed Video Surveillance System
- TV Monitor in office
- Backup DVR

Office
- 2 desks with chairs
- 

Installed Furniture
- Copper Top Bar System
- Reclaimed wood seating booths and bench area
- Built in millwork, countertops and granite

Light Fixtures
- 15 x wall light sconces
- 12 x metal wicker hanging light fixtures
- 4 glass chandeliers
- 2 faux candle light fixtures over bar area

11/9/16

Twisted Cork

## SCHEDULE I

### FINAL RELEASE AND WAIVER OF LIENS

We, the undersigned, are general contractor or subcontractors, materialmen, or other persons furnishing services or labor or materials, as indicated under our respective signatures below, in the construction or repair of improvements upon real estate owned by Landlord and described as follows:

In exchange for payment in the amount of _____, the sufficiency of which is hereby acknowledged, we do hereby, for ourselves, our employees, our subcontractors and materialmen, and all other persons acting for, through or under us, waive, relinquish and release, all right to file or to have filed or to maintain any mechanics' lien or liens or claims against the said building or buildings and appurtenant facilities and structures and real property appurtenant thereto. This Release and Waiver is executed and given in favor of and for the benefit of each and every party legally or equitably, now or hereafter, owning an interest in the subject property and to any party who has made or who in the future makes a loan on said real property and improvements and his, hers, its or their successors and assigns (collectively, the "Owner") and we do further warrant that we have the full right to execute this Release and Waiver and to bind the parties on whose behalf we have affixed our signatures below. This Release and Waiver of Liens shall be an independent covenant and shall operate and be effective as well with respect to work and labor done and materials furnished under any supplemental contract or contracts, whether oral or written, for extra or additional work, and for any other and further work done or materials furnished at any time with respect to the subject property subsequent to the execution of this Release and Waiver.

All of the undersigned respectively warrant that all subcontractors and laborers employed by them upon the aforesaid premises have been fully paid and that none of such subcontractors or laborers have any claim, demand, or lien against said premises; and further, that no chattel mortgage, conditional bill of sale or retention of title agreement has been given or executed by any contractor or other party or any of us, for or in connection with any material, appliances, machinery, fixtures, or furnishings placed upon or installed in the aforesaid premises by any of us, other than:

It is understood and agreed that any and all signatures below are for all services rendered, work done and material furnished previously and in the future by the undersigned in any and all capacities, and are not understood to be only for the particular item against which the signature is affixed. This waiver and release is specifically made for the benefit of the Landlord, and may be relied upon unconditionally by the Landlord.

Twisted Cork

## PAGE TWO OF SCHEDULE I - FINAL WAIVER OF LIENS

Witness the following signatures and seals this __ day of _____, 20__.

(TYPE OF SERVICES, LABOR OR          "Firm"
MATERIAL FURNISHED)                  _____

                                     By: _____
                                     Name: _____
                                     Title: _____

*********************************************************

STATE OF _____ )
                    ) ss:
COUNTY OF _____ )


I, _____, a Notary Public for said County and State, do hereby certify that
personally appeared before me this day and acknowledged that due execution of the foregoing instrument.

Witness my hand and notarial seal this ___ day of _____, 20__.


_____
Notary Public

[Notarial Seal]        My Commission Expires: _____

Twisted Cork

## SCHEDULE II

### AFFIDAVIT

_____, being duly sworn according to law, deposes and states that he is the _____ of _____, that s/he is executing this agreement on behalf of _____, and that the following facts are true and correct to the best of his/her knowledge, information and belief.

1.  Attached hereto as Schedule A is a true and correct list of all contractors, subcontractors, materialmen and other parties who have furnished labor, services, goods or materials in the construction, installation, modification and repair of improvements commonly known as the _____, located at _____ , _____, _____;and

2.  That all of the parties listed on Schedule A have been paid in full for all labor, services, goods or materials utilized in the construction, installation, modification and repair of improvements commonly known as , except for the monies owed to those parties, if any, listed in Schedule B attached hereto.

Further Affiant Sayeth Not.

"Firm"

_____

By: _____
Name:_____

Title:_____

••••••••••••••••••••••••••••••••••••••••••••••••••••

STATE OF _____)
                     ) ss:
COUNTY OF _____)

I, _____, a Notary Public for said County and State, do hereby certify that _____ personally appeared before me this day and acknowledged that due execution of the foregoing instrument.

Witness my hand and notarial seal this ___ day of _____, 20___.

_____
Notary Public

[Notarial Seal]        My Commission Expires:_____

11/9/16

Twisted Cork

Schedule A to Schedule II

Schedule B to Schedule II

Twisted Cork

EXHIBIT D
TO
LEASE

Sign Criteria



Twisted Cork

**EXHIBIT E**
**TO**
**LEASE**

**Prohibited Uses**

Tenant shall not use or permit the use of the Premises for any other business or purpose, except as set forth in Section 201(c) of this Lease and in strict accordance with the Rules and Regulations. No part of the Premises shall be used for any purpose other than retail sales and/or services, offices, restaurants or other commercial purposes which are permitted by applicable zoning and other Laws and which are typically found in first class retail shopping centers in the County in which the Shopping Center is located. No part of the exterior shall be used for an automatic teller machine. No part of the Premises shall be used for any use that would increase the demand or requirement for parking in the Shopping Center in excess of that required by the Permitted Use. No part of the Premises shall be used in a way that endangers the health or safety of any user of the Shopping Center. **THE FOLLOWING PROHIBITIONS AND RESTRICTIONS SHALL NOT BE DEEMED TO APPLY TO LANDLORD, BUT ONLY TO TENANT UNDER THIS LEASE.** Landlord shall have the right, in Landlord's sole and absolute discretion, to waive all or any of the prohibitions set forth herein upon such matters, terms and conditions as Landlord, in its sole discretion, may determine.

The Premises, in whole or in part, shall not be used or operated directly or indirectly for any of the following:

1. The operation of a pick-up/drop off dry cleaning store with on-site dry cleaning services.

2. The operation of a fast casual restaurant primarily serving Chinese food.

**FROM THE DECLARATION:**

Section 1. No Owner shall carry on any noxious or offensive activity upon any Lot or any part of the Property, nor shall anything be done thereupon which may be, or may become, an annoyance or nuisance to the remaining owners or which shall in any way unreasonably interfere with the quiet enjoyment of each owner of his respective Lot. For the purposes hereof, a "noxious or offensive activity" shall be defined as any activity or action which unreasonably interferes with the use of any portion of the Property, any obscene or unlawful conduct or action, any action which endangers life or health, or unreasonably obstructs normal business operations on the Property.

In addition to the foregoing, the following uses and operations shall be prohibited on the Property: (i) funeral establishment; (ii) automobile, truck, boat or other motor vehicle sale, rental, leasing, repair or display establishment, used car lot, or car wash, including body repair facilities and/or service stations (but not excluding facilities selling motor fuels) (iii) pawn shop; (iv) outdoor circus, carnival or amusement park (excluding an otherwise permitted use providing outdoor entertainment incidental to its primary business, such as a restaurant or permitted bar described below providing outdoor seating); (v) bowling alley except as an incidental use; (viii) shooting gallery; (ix) off-track betting (provided that state sponsored lottery tickets shall not be prohibited); (x) any bookstore, theater, amusement facility and/or facility selling or displaying books, magazines, literature, or videotapes containing "Adult Material" as defined below; (xi) any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms; (xii) movie theater or auditorium, meeting hall or ballroom in excess of 10,000 square feet; (xiii) unemployment agency, service or commission; (xiv) adult gymnasium, health club, health spa or dance studio in excess of 5,000 square feet and children's gymnasium in excess of 2,500 square feet, or blood bank as a primary use; (xv) dance hall, pool hall or billiard parlor as a primary use; (xvi) disco, after-hours club, night club, or bar (excluding a so-called "sports bar" or other establishment which sells alcoholic beverages, but where more than fifty percent (50%) of the total sales are food, not alcohol, or a bar within a restaurant meeting the same fifty percent (50%) criteria); (xvii) bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of a business; (xviii) video game or amusement arcade, except as an incidental part of another primary business; (xix) skating or roller rink; (xx) second hand store (except antique stores), auction house, or flea market; (xxi) on site dry cleaning plant; (xxii) storage facility (except as incidental to and in support of retail use); (xxiii) outdoor amusement facility; (xxiv) wholesale and/or distribution operation; (xxv) sporting event or other sports facility (except sporting goods retail and maintenance store); or (xxvi) a massage parlor not associated with a spa.

"Adult Material" is defined as any printed and/or pictorial work that appeals to a prurient interest in sex, is patently offensive according to contemporary community standards, and has no serious literary, artistic, political, or scientific value, and any printed and/or pictorial work rated X, XX, XXX (or of a rating assigned to works containing material more sexually explicit than XXX); provided, however, notwithstanding anything to the contrary contained herein, no material shall be considered Adult Material if it is wholesale, or of the type to be available to the community, through a national broadcast network (i.e., NBC, ABC, CBS or Fox) or is sold or rented by national video or music store retailers such as Blockbuster Video, Hollywood Video, Sam Goody or FYE.

Section 2. Except for during the period of construction and sale of the improvements constructed on the Property, No structure of a temporary character, including but not limited to any trailer, tent shack, barn or other outbuilding shall be constructed or placed on any Lot at any time, either temporarily or permanently, without the prior approval of the Declarant or Board of Directors. Except for construction or sales purposes, an Owner shall permit no temporary trailer, or similar equipment to remain upon the Property. Provided, however, that Walgreen shall be allowed to place temporary storage trailers on the Walgreen Property during the thirty (30) day period prior to Easter, Thanksgiving and Christmas, subject to all applicable laws and local regulations.

Section 3. No animals, livestock or poultry of any kind shall be raised, bred or kept on any Lot.

Section 5. Any lease agreement between an Owner and a lessee shall provide that the terms of the lease are subject in all respects to the provisions of this Declaration and that any failure by the lessee to comply with the terms of this Declaration shall be a default under the lease. All such leases shall be in writing and shall be for a term of not less than six (6) months.

Section 6. None of the foregoing restrictions shall be applicable to the activities of the Declarant, its officers, employees, agents or assigns, in their development, marketing and sale of Lots or other parcels within the Property.

Section 8. No portion of the Property may be used or occupied as an equipment storage yard, a motor vehicle impoundment yard, a motor vehicle storage yard, and/or otherwise for the storage of any types of motor vehicles, either operational or non-operational, or for motor vehicle repair work of any kind and nature whatsoever, or solely for equipment storage and/or the parking of vehicles or equipment of any kind. For the purposes of this Section 8, a "motor vehicle" shall be defined as a device

Twisted Cork

which is self-propelled or designed for self-propulsion, in or upon which any person or property is or may be transported or drawn upon any highway, the ground, or other surface. For the purposes of this Section 8, "motor vehicle repair" shall be defined as any modification, reconditioning, restructuring, painting or rebuilding of a motor vehicle or a motor vehicle component and/or a motor vehicle part or parts.

Section 9. No Lot or any portion of the Property shall be used or occupied as an adult business or a tattoo parlor. For the purposes of this Section 9 "adult business" shall be defined as any bookstore, video store, model studio, movie theater, nightclub, store, or business providing sexually oriented entertainment and/or materials and products or which primarily or regularly exploits an interest relating to sexual activity.

Section 10. Declarant covenants and agrees that, with respect to the Declarant Property and any property directly or indirectly, which Declarant may now or hereafter own, lease or control, and which is contiguous to, or which is within five hundred (500) feet of any boundary of, the Walgreen Property (the "Declarant's Other Property"), will not be used for any one or combination of the following: (i) the operation of a drug store or a so-called prescription pharmacy or prescription ordering, processing or delivery facility, whether or not a pharmacist is present at such facility, or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind; (ii) the operation of a medical diagnostic lab or the provision of treatment services (other than as part of a medical, dental, physician, surgical or chiropractic office[s], which office[s] shall not be restricted by this subclause [ii]); (iii) the sale of so-called health and beauty aids or drug sundries, except that the sale of health and beauty aids or drug sundries shall be permitted on Declarant's Other Property as incidental to the primary use; (iv) the operation of a business in which photofinishing services (including, without limitation, digital photographic processing or printing, or photographic film are offered for sale), except sales of photographic film shall be permitted on Declarant's Other Property as incidental to the primary use and photographic imaging shall be permitted by FedEx/Kinko's, Office Max, Staples and/or other similar national retailers as an incidental use; in addition, photographic imaging shall be permitted as a primary use by any graphic design studios and photography studios (for purposes of this clause (iv), Wolf Camera, Ritz Camera and other similar businesses shall not be deemed to be a photography studio) (v) the operation of a business in which greeting cards or gift wrap, except that sales or greeting cards or gift wrapping materials shall be permitted on Declarant's Other Property as incidental to the primary use; and (vi) the operation of a business in which prepackaged food items for off premises consumption are offered for sale, provided the foregoing restriction shall not apply to any anchor grocery store located on Declarant's Other Property and that other users located on Declarant's Other Property shall be allowed to sell prepackaged food items for off-premises consumption as incidental to the primary use. The term "incidental" as used herein shall mean two hundred (200) feet of the respective tenant's total sales area for the applicable leased premises.

Twisted Cork

All notices or other communications to be provided pursuant to this Guaranty shall be in writing and shall be deemed to be properly served if sent by Federal Express or similar courier service with overnight delivery, or by professional messenger service (with receipt therefor) or by certified or registered mail, return receipt requested, (i) if to Landlord, 9050 Devlin Road, Bristow, Virginia 20136, and (ii) if to Guarantor, at the address set forth below. All notices or other communications to be provided pursuant to this Guaranty sent by certified or registered mail, return receipt requested, first-class postage prepaid shall be deemed effective when they are mailed, otherwise such notices or other communications shall be effective upon receipt.

Notwithstanding anything to the contrary contained herein, Guarantor's liability for Rent hereunder shall not exceed $50,000.00, beyond Security Deposit, 201(f), and 2nd Security Deposit, 201(h), as defined herein.

40,000.00

**Waiver of Jury Trial.** GUARANTOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL CLAIMS, CAUSES OF ACTION AND/OR ISSUES IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND GUARANTOR OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OF ITS PROVISIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NEITHER LANDLORD NOR ANY PERSON ACTING ON BEHALF OF LANDLORD HAS MADE ANY REPRESENTATIONS OF FACT OR LAW TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER ACKNOWLEDGES THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS GUARANTY AND THIS WAIVER WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal effective as of the Date of Lease.

WITNESS:

_____

GUARANTOR:

_____ (SEAL)
Nancy Skipper
Notice Address:   2918 Saratoga Drive, Winchester, VA 22601

WITNESS:

_____

GUARANTOR:

_____ (SEAL)
John Skipper
Notice Address:   2918 Saratoga Drive, Winchester, VA 22601

All notices or other communications to be provided pursuant to this Guaranty shall be in writing and shall be deemed to be properly served if sent by Federal Express or similar courier service with overnight delivery, or by professional messenger service (with receipt therefor) or by certified or registered mail, return receipt requested, (i) if to Landlord, 9050 Devlin Road, Bristow, Virginia 20136, and (ii) if to Guarantor, at the address set forth below.  All notices or other communications to be provided pursuant to this Guaranty sent by certified or registered mail, return receipt requested, first-class postage prepaid shall be deemed effective when they are mailed, otherwise such notices or other communications shall be effective upon receipt.

Notwithstanding anything to the contrary contained herein, Guarantor's liability for Rent hereunder shall not exceed $40,000.00, beyond Security Deposit, 201(f), and 2nd Security Deposit, 201(h), as defined herein.

**Waiver of Jury Trial.**  GUARANTOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL CLAIMS, CAUSES OF ACTION AND/OR ISSUES IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND GUARANTOR OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OF ITS PROVISIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NEITHER LANDLORD NOR ANY PERSON ACTING ON BEHALF OF LANDLORD HAS MADE ANY REPRESENTATIONS OF FACT OR LAW TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  GUARANTOR FURTHER ACKNOWLEDGES THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS GUARANTY AND THIS WAIVER WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the undersigned has executed this Guaranty under seal effective as of the Date of Lease.

WITNESS:

_____

GUARANTOR:

_____ (SEAL)
Nancy Skipper
Notice Address:   2918 Saratoga Drive, Winchester, VA 22601

WITNESS:

_____

GUARANTOR:

_____ (SEAL)
John Skipper
Notice Address:   2918 Saratoga Drive, Winchester, VA 22601

Twisted Cork

**EXHIBIT F**
**TO**
**LEASE**

**Guaranty**

In order to induce BC PLAZA, LLC ("Landlord") to execute and deliver that certain Shopping Center Lease (the "Lease") between Landlord and SKIPPER ENTERPRISES LLC, a Virginia Limited Liability Company, d/b/a Twisted Cork Grill ("Tenant") for the Premises which contains 2,400 square feet of gross leasable area (as the same may be altered, expanded, reduced or relocated) in Bristow Commons, at 9100 Devlin Road, Building 3, Unit 180, Bristow, Virginia 20136 ("Shopping Center"), and in consideration thereof, the undersigned, Nancy Skipper and John Skipper, an individual (the "Guarantor"), hereby unconditionally, absolutely and irrevocably guarantees to Landlord, and its successors and assigns, the prompt and full payment and performance by Tenant of each and every item, covenant, condition, provision and obligation to be paid, kept, observed or performed by Tenant under the Lease, together with any and all costs and expenses, including reasonable attorneys' fees, which may be incurred by Landlord in connection with any default by Tenant under the Lease or enforcing the Lease and/or this Guaranty (collectively the "Obligations"). Guarantor expressly acknowledges that he, she or it has reviewed the Lease and understands the same. If there is; more than one Guarantor, the terms and conditions of this Guaranty shall apply to all Guarantors, and they shall all be jointly and severally liable for all obligations. The liability of Guarantor is coextensive with that of Tenant and also joint and several, and legal action may be brought against Guarantor and carried to final judgment either with or without making Tenant or any assignee or successor thereof as a party thereto.

The undersigned further covenants and agrees that Landlord may at any time or from time to time, in its sole and absolute unfettered discretion, without notice to the undersigned:

(a) Extend or change the time of payment of amounts required to be paid by Tenant under said Lease, and/or the manner, place or terms of performance or observance of any of the terms, covenants, conditions, provisions or obligations to be kept, observed or performed by Tenant under the Lease; and/or

(b) Modify any of the terms, covenants, conditions or provisions of the Lease, and/or waive compliance with any of the terms, covenants, conditions, provisions or obligations under the Lease.

Payment by the undersigned under this Guaranty is to be made without requiring any proceedings to be taken against Tenant for the collection of any amounts owed by Tenant under the Lease or for the keeping, performing or observing of any of the terms, covenants, conditions, provisions or obligations to be observed by Tenant under the Lease. The undersigned hereby completely and fully waives (a) notice of acceptance of this Guaranty, (b) presentment for payment, (c) notice of dishonor or default of Tenant under the Lease, (d) protest and notice of protest thereof, (e) any right of setoff, recoupment, counterclaim, abatement or deduction against amounts due under this Guaranty, (f) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance, and (g) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

Without limiting the generality of the foregoing, the liability of the undersigned under this Guaranty shall not be deemed to have been waived, released, discharged, terminated, impaired or affected by (a) reason of any waiver or failure to enforce or delay in enforcing any of the Obligations, or (b) the granting of any indulgence or extension of time to Tenant, including but not limited to the payment of Rent or the performance of any of the obligations of the Tenant or forbearance or delay on the part of the Landlord to enforce any of the provisions, covenants, terms, agreements, conditions or stipulations of the Lease, or (c) the assignment of the Lease, or the subletting of the Premises by Tenant, with or without Landlord's consent, or (d) the expiration of the Term of the Lease, or (e) Tenant's holding over beyond the Term of the Lease, or (f) any merger or reorganization or the release or discharge of Tenant or any other guarantor in any voluntary or involuntary receivership, bankruptcy, winding-up or other creditors' proceedings, or (g) the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, or (h) the release of any collateral held for the Obligations, or (i) any defect or invalidity of the Lease, or (j) the transfer by Guarantor of any or all of the capital stock of Tenant. The liability of the Guarantor shall not be affected by any repossession, re-entry or re-letting of the Premises by Landlord, provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and/or reletting the same (including, without limitation, any attorney fees, brokerage fees and any reasonable costs or expenses incurred in redecorating, remodeling, or altering the Premises for reletting) shall be credited from time to time by Landlord to the account of Tenant and Guarantor and Guarantor shall pay any balance owing to Landlord from time to time, immediately upon being given written notice of demand by Landlord in the manner for providing notice set forth in the Lease.

If Tenant hold over beyond the term of the Lease, Guarantor's obligations hereunder shall extend to such holdover period and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any modification thereof.

This Guaranty shall be binding upon the undersigned, and all successors, assigns, personal or legal representatives and heirs, and shall inure to the benefit of Landlord and Landlord's successors and assigns. The undersigned hereby consents and agrees that this Guaranty may be assigned by Landlord, without recourse, in connection with any sale or assignment by Landlord of part or all of its interest in the Shopping Center in which the Premises under the Lease are contained.

This Guaranty shall remain in full force and effect until the payment and/or performance of all of the Obligations and all other amounts payable under this Guaranty (whether or not the Lease shall have been terminated). Until the payment and/or performance of all of the Obligations and all amounts payable under this Guaranty, Guarantor: (a) shall have no right of subrogation against Tenant by reason of any payments or acts of performance by the Guarantor in compliance with the obligations of Guarantor under this Guaranty; (b) waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor under this Guaranty; and (c) subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to the Landlord under the Lease.

The terms, covenants, provisions, conditions and obligations contained in this Guaranty may not be waived, changed, modified, discharged, terminated or abandoned, except by agreement in writing, signed by Landlord and Guarantor. Guarantor agrees that it will, from time to time, within ten (10) days after Landlord's request, execute and deliver a statement certifying that this Guaranty is unmodified and in full force and effect. Guarantor hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Guarantor's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such statement if Guarantor shall fail to do so within such ten (10)-day period.

Twisted Cork

### Rider of Additional Lease Provisions

The following special provisions are hereby made a substantive part of this Lease as fully as if set forth within the main text of this Lease:

1. Extension Terms.

(a)     Landlord hereby grants to Tenant the conditional right, exercisable at Tenant's option, to extend the Term for two (2) consecutive periods of five (5) Lease Years each (each an "Extension Term"), exercisable as to each such period as hereinafter provided. If properly exercised and if the conditions applicable thereto have been satisfied, the first extension term shall commence immediately following the end of the Initial Term provided in Section 201(b) of this Lease, and the second extension term shall commence immediately upon expiration of the first extension term, and in such event, each such extension term (an "Extension Term") shall be deemed to be part of the Term. The right of extension herein granted to Tenant shall be subject to, and shall be exercised strictly in accordance with, the following terms and conditions.

(b)     Tenant shall exercise an Extension Option with respect to an Extension Term by giving Landlord written notice of the exercise thereof (the "Option Notice") not later than six (6) months prior to the expiration of the Term then in effect. Time is of the essence as to all dates pertaining to Tenant's exercise of any Extension Option. If an Option Notice is not given timely or if Tenant does not exercise an Extension Option or if Tenant has been in default under this Lease at any time during the Term or if Tenant has assigned this Lease or sublet all or any portion of the Premises, then, at Landlord's election, the Option Notice shall be void and Tenant's right of extension with respect to such Extension Term and all unexercised Extension Options and uncommenced Extension Terms granted hereby shall thereupon and thereafter lapse, terminate and be of no further force or effect. In no event shall Tenant have the right to extend the Term beyond the expiration of the second Extension Term.

(c)     During each Extension Term, if properly exercised, all the terms, conditions, covenants and agreements set forth in this Lease shall continue to apply and be binding upon Landlord and Tenant, except that the Minimum Rent payable during each Extension Term (including annual rent escalations) shall be the market rent as reasonably established by Landlord. Landlord shall deliver a notice setting forth the Extension Term Minimum Rent within approximately twenty-one (21) days following its receipt of the Option Notice for the Extension Term. If Tenant disagrees with Landlord's determination of "market rent", then Tenant shall notify Landlord in writing of such objection within ten (10) days after receiving the aforementioned notice. Upon Landlord's receipt of such objection notice, Landlord and Tenant shall negotiate in an effort to agree on market rent (but in no event shall the annual Minimum Rent for each Lease Year of the Extension Term be less than the Minimum Rent for the immediately preceding Lease Year increased by three percent (3%) annually); however, if Landlord and Tenant cannot agree on market rent for any reason within fifteen (15) days after the date on which Landlord received Tenant's objection notice, then the Option Notice shall be void and Tenant's right of extension with respect to the Extension Term and all unexercised Extension Options and uncommenced Extension Terms granted hereby shall thereupon and thereafter lapse, terminate and be of no further force or effect. Once the market rent has been determined, Landlord may draft a lease extension and rent amendment and forward same to Tenant for execution, and Tenant shall execute same and return same to Landlord within ten (10) days after receipt thereof.

(d)     If plaza parking remains incomplete after Initial Term of 3 years, Landlord will hold rent at $31/SF NNN in the first two (2) years of Extension Term..

(e)     Tenant hereby specifically acknowledges and agrees that the time limitations upon the exercise of each Extension Option will be strictly enforced, that any attempt to exercise any Extension Option at any other time shall be void and of no force or effect, and that if any Extension Option is not exercised within the applicable time period, Landlord intends immediately thereafter to undertake appropriate efforts relating to the marketing or management of the Premises. The period of time within which any Extension Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise such Extension Option because of any provisions of this Paragraph 1 or for any other reason whatsoever.

2. Special Restaurant Provisions.  Without limiting Tenant's obligations elsewhere under this Lease, Tenant shall provide the following services and maintenance at its sole cost and expense:

(a)     Tenant shall cause extermination services, including treatment for insects, spiders, rats, mice, moles and other rodents, to be provided to the Premises by a reputable exterminator on a monthly basis, or more often as Landlord, in Landlord's reasonable discretion, may require, at Tenant's expense. Tenant agrees to exercise special care in its handling of garbage, waste, and refuse and will remove such materials from the Shopping Center as frequently as is necessary in order to prevent pests from entering the Premises or the Shopping Center. In the event any such pests are discovered in or about the Premises, Tenant will immediately take all necessary and appropriate measures to relieve the Shopping Center of such pests.

(b)     In order to eliminate the problem of sewer back-ups and health hazards, Tenant shall install and maintain grease traps in the Premises, the type and manner of installation of such grease traps being subject to Landlord's prior written approval and all governmental laws and requirements, and shall establish a quarterly cleaning program with respect thereto. In addition to the quarterly cleaning of the grease traps, Tenant shall use "Clorobam PT" or a similar type of chemical in all drain lines, in accordance with the manufacturer's recommendations, to help dissolve any grease build-up. Tenant shall provide Landlord with copies of its cleaning contract for its grease traps and its extermination contracts prior to December 5, 2016. Without limitation of any of the foregoing, Tenant shall do whatever is necessary in order to maintain properly the grease trap and prevent, at all times, any overflow or discharge of grease at the surface of the grease trap manhole or other access point. The grease trap and all plumbing pipes shall be rooted and cleaned regularly and as often as necessary to prevent clogging or discharge. In the event of any such overflow or discharge, Tenant shall be responsible for all costs of cleanup of the overflow or discharge, including all costs of removing grease, and repair, restoration or replacement of property damaged by such overflow or discharge. Any solid fuel cooking operations (i.e., wood burning stoves) shall be inspected monthly. Any fire suppression equipment used in the cooking hood shall be inspected at least two (2) times per Lease Year and the results thereof shall be provided to Landlord.

(c)     The kitchen exhaust systems, including roofing hoods, ducts and fans used in connection with the kitchen operation, whether located in or outside of the Premises, shall be maintained by Tenant in good condition so as to meet the

Twisted Cork

highest standard of cleanliness and health. Tenant shall establish a quarterly (or more frequent as conditions may warrant in Landlord's reasonable discretion) cleaning program with respect thereto. Tenant shall provide Landlord with a copy of its cleaning contract for the exhaust system prior to opening for business. Tenant shall do whatever is necessary in order to properly maintain the exhaust system. In the event of discharge, Tenant shall be responsible for all costs of clean up, including all costs of repair, restoration or replacement of property damaged by such discharge. Tenant's cleaning contract shall provide for grease deposit removal from all surfaces (powder coating is not permitted).

(d)      Tenant shall store all trash and other waste in odor and vermin proof containers, such containers to be kept in temperature controlled areas not visible to members of the public. Trash removal must be done by Tenant using containers approved by Landlord and at such times and in such manner as Landlord may reasonably direct and subject to such rules and regulations in respect thereto as Landlord may, from time to time, adopt.

(e)      Tenant shall make the following items part of a continuing maintenance program in order to reduce the possibility of fire:

(i)      Cooking hood filters and/or grease extractors shall be cleaned weekly.

(ii)      The entire exhaust system shall be inspected by a properly trained, qualified, and certified company or person quarterly and any such inspection report shall be provided to Landlord.

(iii)      After inspection, if components are found to be contaminated with deposits from grease laden vapors, the entire exhaust system (hoods, grease removal devices, fans, ducts, and other included appurtenances) shall be cleaned by a properly trained, qualified and certified company or person. The cleaning shall be to bare metal using mechanical means (scraping, washing, steam cleaning, etc.) and not coated with chemicals or powder. A certificate of service shall be provided by any contracted service and delivered to Landlord.

(iv)      Tenant shall install (and maintain and replace as necessary) a fire extinguishing system within the hood and duct of the cooking facility which satisfies the requirements now and hereafter established by municipal codes and Landlord's insurer and shall provide Landlord with a certificate that same has been installed.

(f)      Tenant acknowledges that the operation of a restaurant can cause odors in and about the Premises. Tenant agrees that it shall install, and properly maintain in good working order throughout the Term, such ventilation and other equipment as required by municipal codes and as may be necessary to relieve the Premises and the adjoining and surrounding premises of any odors caused by Tenant's business operation, which may include special vents to create negative pressure. Tenant shall defend, indemnify and hold Landlord harmless of and from any loss, cost or expense (including attorneys' fees) arising out of odor or other conditions in the Premises. Tenant agrees to exercise special care in its handling or garbage, waste, and refuse and will remove such materials from the Shopping Center as frequently as is necessary in order to eliminate all odors.

(g)      Tenant agrees to (i) maintain all queuing which occurs due to the use of the Premises, in an orderly fashion whether such queuing occurs inside or outside of the Premises; and (ii) keep all crowds which may gather due to the use of the Premises, under control whether such crowds gather inside or outside the Premises. If Landlord determines, in its sole judgment, that Tenant has not complied with the foregoing provisions of this paragraph (g), Tenant will, upon Landlord's direction and at Tenant's sole cost and expense: (a) hire a security guard or guards, and/or (b) install temporary and removable crowd control devices in areas designated by Landlord. Tenant agrees to follow Landlord's other directions regarding orderly queuing and crowd control.

(h)      If Tenant fails to comply with any of the provisions of this Paragraph 2, it shall be an Event of Default under this Lease, and in addition to any rights of Landlord under this Lease, at law or in equity, Landlord shall have the right to perform such work on Tenant's behalf and Tenant shall reimburse Landlord for the cost and expense thereof.

3.  **Right of First Offer.** Prior to Notice of Possession, if Landlord elects in its sole discretion (it being understood that Landlord has no obligation to look for another tenant for the Premises) to lease the Premises to another tenant, Landlord shall provide notice of such election to Tenant and Tenant shall have the right to terminate this Lease by providing notice to Landlord within five (5) days of Landlord's notice to Tenant. Alternatively, and at no obligation to Landlord, if Tenant does not desire to terminate this Lease and if an end-cap premises is available in Building 2 ("Other Space") with approximately the same square footage as the Premises, then, Tenant shall have a right of first offer to lease, for the use described in Section 201(c) of this Lease. Landlord agrees to provide Tenant with written notice offering Tenant a right to lease the Adjacent Space, which notice shall set forth the current market rent for such space ("Landlord's Notice"). In the event Tenant elects to proceed to lease the Other Space pursuant to the Landlord's Notice, then Tenant shall notify Landlord of such election by giving notice to Landlord within ten (10) days after Landlord's Notice and Landlord and Tenant shall thereupon enter into an amendment to this Lease or a renewal lease for the leasing of the Other Space, which amendment or new lease shall contain the terms and conditions set forth in the Landlord's Notice, provided that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term of this Lease, and contain such other terms and provisions as Landlord may require in order to effectuate the incorporation of the Other Space into the Premises and to otherwise effectuate the intent of this Paragraph 3 (including, without limitation, Tenant's obligation to pay the costs to construct and build out the Other Space, if necessary, including any changes necessary to combine the Adjacent Space and the Premises, it being understood that Tenant shall accept the Other Space in its then "as is" condition). Should Tenant fail to timely respond pursuant to this Paragraph 3, or if an amendment or new lease for Tenant's lease of the Other Space is not executed within thirty (30) days after the date of the Landlord's Notice, then in either event, Tenant shall have been deemed to have waived its right of first offer to the Other Space, Landlord may lease the Other Space to any other party upon such terms and conditions as Landlord deems appropriate, in its sole discretion, and the terms of this Paragraph 3 thereafter shall be deemed null and void.

11/9/16

Twisted Cork

**EXHIBIT H**
**TO**
**LEASE**

**Tenant's Menu**

**TO BE ATTACHED**

Twisted Cork

John S. Skipper
Nancy L. Skipper
Ph. 540-722-3019
2918 Saratoga Dr
Winchester, VA 22601-2640

68-183/514
543

3601

11/9/16   DATE

PAY TO THE
ORDER OF  BC Plaza

$ 8500 00

Eight thousand five hundred & no/100   DOLLARS

First Citizens
Bank

Premier

FOR  Deposit to acct to 1500-

⑈051401836⑈0089233290 70⑈  0360

AP